STATE of Missouri,
Plaintiff-Respondent,

v.

George Clifton GILMORE,
Defendant-Appellant.

No. 65381.

Supreme Court of Missouri,
En Banc.

Dec. 18, 1984.

Rehearing Denied Jan. 15, 1985.

936

Robert B. Ramsey, St. Louis, for defendant-appellant.

John Ashcroft, Atty. Gen., George Cox, Asst. Atty. Gen., Jefferson City, for plaintiff-respondent.

GUNN, Judge.

Defendant George Gilmore was convicted by a jury of capital murder, § 565.001, RSMo 1978, for his participation in the robbery and slaying of Woodrow Wilson Elliott. The jury recommended the death penalty and the defendant was sentenced accordingly. Defendant alleges nearly 30 instances of error, which have been assimilated into four major categories: 1) the trial court's ruling on motions before and during the trial prevented the defendant from properly preparing and presenting an effective defense; 2) the prosecutor's actions during the trial and his arguments and examination of witnesses exceeded the bounds of propriety; 3) trial court rulings during the jury selection were erroneous; and 4) the imposition of the death penalty

was unconstitutional, disproportionate and excessive.

None of the alleged errors warrants reversal, and the judgment is affirmed.

In October 1980, defendant, his wife and her five children [1] lived in a two bedroom trailer in Mineral Point, Missouri. Residing with them were defendant's brother, Norman Gilmore, defendant's sister and her six children and the sister's boyfriend, Leonard Laws. This made for a total of five adults and 11 children in the trailer. None of the adults was gainfully employed.

In need of funds, defendant contrived a plan whereby he and his homemates could gain some "easy money." Defendant suggested that he, Norman Gilmore and Leonard Laws would prey on elderly persons, robbing them of their money and then killing them to silence their tongues and prevent any identification. It was defendant's theory that elderly people did not trust banks and kept substantial sums of money in their houses.[2]

Norman Gilmore and Laws readily agreed to follow defendant's malevolent plan. In this case, Woodrow Wilson Elliott was selected by defendant to be his somewhat perfect victim. Poor Mr. Elliott, also known as Mr. Wilson, was elderly, lived alone and was handicapped from birth by the absence of legs and one arm. Defendant had known Elliott since he was a child and was fully aware of his disability.

In the early morning hours of October 8, 1980, defendant, Norman Gilmore and Laws traveled to Mr. Elliott's home, awakened him and then kicked and choked him to unconsciousness. The trio then ransacked the home and found $4,600 which was hidden in a jar. As the victim commenced to regain his senses, defendant ordered Laws to "take care of him." Laws complied with defendant's command and killed the hapless victim by stabbing him in the head with a knife, the force of the blow bending the knife blade. The three men then set fire to the victim's house and returned to their cramped quarters in Mineral Point.

Police and fire department officials were alerted to a fire at the Elliott residence and arrived to find the house engulfed in flames. The victim's body was charred beyond recognition, and his death originally was ruled accidental. Later investigation revealed very low levels of carbon monoxide saturation, indicating that the victim died prior to the fire.

Elated at their success from the Elliott robbery, the defendant and Laws bragged about the crime. They attempted to entice two other men, Robert Gilmore, a deceased cousin, and Bob DeClue, into joining the senseless and meretricious conspiracy to kill the elderly. The defendant rationalized that he was doing the victims a "favor", because the elderly had no reason to live.

Robert Gilmore and DeClue notified police, and defendant and Laws were arrested a short time later. While in custody, the defendant gave a taped confession to the police of his involvement in the crime. Norman Gilmore also was arrested for his part in the Elliott murder. Norman, however, pleaded guilty to a lesser charge and agreed to testify as a state's witness.

I.

Initially, defendant alleges that he was prevented from presenting his best defense due to trial court rulings prior to and during trial; the first being the refusal to order a psychiatric examination for him.

Motion for the examination was made 48 days prior to the scheduled trial date and on objection by the state, the motion was

1. Defendant's wife, Linda Geisler—she had divorced defendant and remarried at the time of trial—had one child by defendant, two from a previous marriage and two out of wedlock by Leonard Laws.

2. The scheme devised by defendant of robbing the elderly and then doing them in was part of the same perverse plot that resulted in death penalty convictions for him in *State v. Gilmore*, 661 S.W.2d 519 (Mo. banc 1983), *cert. denied*, — U.S. ——, 104 S.Ct. 1931, 80 L.Ed.2d 476 (1984), and *State v. Gilmore*, 650 S.W.2d 627 (Mo. banc 1983).

overruled. Despite defendant's contrary assertion, there was no error in this ruling.

Defendant had been the beneficiary of seven prior psychiatric examinations, including two in this cause. Five of the examinations were made in connection with other capital murder charges against defendant pending at the time as this case. None of the examinations disclosed a mental disease or defect within the meaning of Missouri's criminal statutes, §§ 552.020 and 552.030, RSMo Cum.Supp.1983.

■ Section 552.020.5 allows written request of another examination if given within five days of a previous psychiatric report, and the trial court is vested with broad discretion in granting or denying an untimely motion for another examination. *State v. Collier,* 624 S.W.2d 30, 33 (Mo. App.1981). Defendant concedes that there was no timely objection to the prior reports or request for another examination. Under the circumstances of this case, it is manifest that the trial court's refusal to order an eighth mental examination was not an abuse of discretion.

Defendant argues that the trial court's ruling against the additional mental examination precluded investigation of the defense of diminished mental capacity due to his low I.Q.; that his mental capacity had never been fully assessed. But this is not so.

■ A review of the transcripts of defendant's two other capital murder trials, transcript at 605 (guilt phase), *State v. Gilmore,* 661 S.W.2d 519 (Mo. banc 1983), *cert. denied,* ── U.S. ──, 104 S.Ct. 1931, 80 L.Ed.2d 476 (1984); transcript at 65 (sentencing phase), *State v. Gilmore,* 650 S.W.2d 627 (Mo. banc 1983), reveals that a psychiatrist testified on defendant's behalf and placed defendant's I.Q. at a level between 70 and 85.[3] During trial in this case, defendant's counsel made frequent reference to the earlier trials and acknowledged familiarity with the transcripts. Due to his

acquaintance with the testimony in the prior trials, defendant's counsel cannot justify an excuse of unawareness of defendant's intelligence level or that there had been no estimation made of his mental capacity.

■ There is yet further reason for rejecting defendant's low I.Q. defense. That factor, standing alone, will not serve as licit basis for a defense of diminished mental capacity. *See State v. Shaw,* 636 S.W.2d 667 (Mo. banc 1982), *cert. denied,* 459 U.S. 928, 103 S.Ct. 239, 74 L.Ed.2d 188 (1982), (I.Q. of 73 will not serve as evidence of diminished mental capacity); *State v. Brizendine,* 391 S.W.2d 898 (Mo.1965), (I.Q. of 74 did not establish mental disability to provide excuse or defense to crime).

■ Defendant next raises three instances in which the trial court restricted cross-examination of two state's witnesses, Norman Gilmore and Robert DeClue. There is no need to dwell on this matter. It is sufficient to note that in each instance, defense counsel's questions were either repetitive, improperly phrased or argumentative. "Although cross-examination is a fundamental component of confrontation, it is not unlimited." *State v. Russell,* 625 S.W.2d 138, 141 (Mo. banc 1981). A trial court has broad discretion to disallow repetitive and harassing interrogation, to limit attacks on general credibility, and to preclude attempts to elicit irrelevant, collateral or stale matters. *Id.* Further, in each of the instances, the jury received the gist of the testimony that the defense counsel attempted to develop. Therefore, even if there had been error in sustaining objections to these isolated questions, the court's rulings were not prejudicial to the defendant. *State v. Butler,* 534 S.W.2d 832, 835 (Mo.App.1976).

Defendant also avers that the trial court failed to hold a hearing on his motion to suppress his confession to the Elliott murder. This point is denied, as the transcripts

---

**3.** This Court may take judicial notice of the transcripts of the defendant's other capital murder trials. *State v. Wynn,* 391 S.W.2d 245, 247

(Mo.1965); *Franklin v. State,* 655 S.W.2d 561, 563 (Mo.App.1983).

from the hearing on this matter belie the assertion.

■ Defendant alternatively argues that the hearing on the motion to suppress was improperly combined with motions made in another murder case. He contends this violated § 565.004, RSMo Cum.Supp.1983. This contention also fails. The statute cited by defendant, assuming it would preclude the joinder of two suppression hearings, was not in effect at the time these motions were heard. Secondly, it is clear that the combined hearing was held for the convenience of all of the parties, as defendant was being represented by the same counsel in both murder cases which were pending in St. Louis County.

■ The next alleged error is that defendant was unable to adequately prepare a defense due to the court's refusal to appropriate funds for witnesses. *State v. Holland,* 653 S.W.2d 670, 677–78 (Mo. banc 1983), *cert. denied,* —— U.S. ——, 104 S.Ct. 495, 78 L.Ed.2d 689 (1983), and *State v. Woods,* 662 S.W.2d 527, 533 (Mo.App.1983), are dispositive on this point. There is no constitutional mandate to provide witnesses for the defense at state expense. "Whether to provide public funds to aid an accused in the preparation of his defense is within the discretion of the trial court." *State v. Holland,* 653 S.W.2d at 678. But for one exception, the defendant's request was ambiguous. There was no abuse of discretion in the trial court's refusal to allow defendant a "blank check" for the employment of witnesses.

■ The only witness specifically identified was Dr. James Gilsanin, a professor of sociology, who was to testify as to the deterrent value of the death penalty. It is aphoristic that the sentencing phase of the trial is not designed to serve as a forum for a general debate on the attributes of capital punishment. The bifurcated procedure was devised to avoid the imposition of the death sentence in an arbitrary and capricious manner. *State v. Royal,* 610 S.W.2d 946, 950 (Mo. banc 1981). However, it is

apparent from defendant's motion that Dr. Gilsanin's testimony would not have focused upon the specifics of the defendant's case and, therefore, would not have assisted the jury in imposing a rational sentence. *See Gregg v. Georgia,* 428 U.S. 153, 191–92, 96 S.Ct. 2909, 2933–34, 49 L.Ed.2d 859 (1976).

■ This Court has recognized that the death penalty serves the legitimate purposes of retribution and incapacitation, and the legislature may find that the penalty serves the purpose of deterrence. *State v. Trimble,* 638 S.W.2d 726, 737 (Mo. banc 1982), *cert. denied,* 459 U.S. 1188, 103 S.Ct. 838, 74 L.Ed.2d 1031 (1983). Therefore, the trial court's decision to refuse funds for the employment of an expert witness, whose testimony was irrelevant to the issue at hand, was not erroneous. The fact that another trial court might have been more gratuitous in Leonard Laws' case [4] in permitting the presentation of Dr. Gilsanin's testimony does not make the trial court's ruling error in this instance.

## II.

The defendant's next grouping of allegations lists 13 instances of prosecutorial error. Only five of the examples have been developed in his brief. Those which are not are deemed abandoned. *State v. Heitman,* 473 S.W.2d 722, 727–28 (Mo.1971); *State v. Sanders,* 619 S.W.2d 344, 349 (Mo. App.1981). However, by reason of the gravity of defendant's sentence, each will be considered.

Most of the incidents in this category concern the alleged improper introduction of evidence of other crimes.

■ The first deals with the testimony of defendant's former wife who was asked if defendant's junk business entailed something other than selling junk. Defendant argues that the question necessarily implies that he was dealing in stolen goods. Objection to the question was sustained, and defendant's wife did not pro-

4. *State v. Laws,* 668 S.W.2d 234 (Mo.App.1984).

942

vide any answer. Assuming the question to be improper, the general precept applies here that when such a question is asked but not answered, no prejudicial error occurs. *State v. Williams*, 652 S.W.2d 102, 110 (Mo. banc 1983); *State v. Pirtle*, 652 S.W.2d 272, 273 (Mo.App.1983).

Defendant next asserts that defendant's former wife was permitted to describe how Norman Gilmore, the defendant's brother, bragged about killing "a few people." No error is demonstrated, as the rule excluding evidence of other crimes does not apply where there is no evidence linking the accused to the other crime. *State v. Laws*, 668 S.W.2d 234, 237 (Mo. App.1984). The reference to Norman Gilmore in this instance does not necessarily implicate the defendant.

The prosecutor was permitted to bring out through various witnesses that after Mr. Elliott's killing defendant had purchased certain firearms and that at the time of his arrest he possessed numerous weapons. Defendant's point in this regard is that evidence of weapons is irrelevant, as there was no connection between these weapons and the killing of Mr. Elliott.

This same contention was raised and rejected in Leonard Laws' trial for his participation in Mr. Elliott's murder. *State v. Laws, supra.* As noted in *Laws*, the state's theory was that the motive for the Elliott murder was theft. The defendant and his cohorts took $4,600 from the crippled man's home before setting the house and the victim ablaze. Testimony revealed that all three men who participated in the crime were absolutely penurious prior to the murder but made large purchases immediately thereafter. The defendant's purchases included weapons which were to be used in an insensate design to kill other elderly people. Since the evidence was relevant to motive and common scheme or plan, it was admissible. *State v. Williams*, 652 S.W.2d at 110; *State v. Trimble*, 638 S.W.2d at 732; *State v. Shaw*, 636 S.W.2d at 672.

Likewise, evidence of a banking transaction made by Laws shortly after the murder was relevant as circumstantial evidence of the motive for the murder.

The next matter raised as to prosecutorial error is a little more complex but, again, does not call for reversal. The arresting police officer was queried about the plan for arresting those implicated in murder by Robert Gilmore and Robert DeClue. In so doing the officer stated that the victim had been "Williams" ["The victim of that one was Williams"]. The prosecutor immediately clarified and corrected the foregoing statement by asking: "You mean Wilson." This correction was for the obvious reason that the victim was better known as "Mr. Wilson" rather than Mr. Elliott.

Defendant complained in a colloquy at the bench that the officer's statement raised evidence of defendant's earlier conviction for the dual murders of Clarence and Lottie Williams. *See State v. Gilmore*, 650 S.W.2d 627 (Mo. banc 1983). The court rejected a motion for a mistrial but offered alternative curative measures: 1) permit the witness to explain his answer, or 2) instruct the jury to disregard the officer's statement. Both measures were rejected by the defense. Defendant now complains that the trial court erred in refusing to declare a mistrial.

Due to the similarity of the names "Williams" and "Wilson," it is evident that the officer's statement was inadvertent. At trial defense counsel conceded that the officer's statement may have been a mistake. This predicament resembles those situations in which a state's witness volunteers an unresponsive reference to an unrelated and distinct crime. In such instances, a reversal is not automatic but is dependent upon the circumstances of the case. *State v. Warden*, 591 S.W.2d 170, 172 (Mo.App. 1979). Here, the state made no effort to emphasize the volunteered response. There was an immediate correction made. The reference to "Williams" was isolated and was specifically in the singular rather than a reference to any dual killing of a couple. The reference was not by any

stretch of imagination clear evidence of another crime. Additionally, it was certainly corrected by the prosecutor's prompt action, through the officer's explanation, that "Wilson" was intended to be the answer and that defendant was arrested for the "Wilson matter."

▮▮▮ A motion for a mistrial is addressed to the sound discretion of the trial judge, *State v. Lee*, 654 S.W.2d 876, 879 (Mo. banc 1983), and in this case there is no error in failing to grant the motion. The declaration of a mistrial is a drastic remedy to be employed only in the most extraordinary of circumstances. *Id.* Any error in failing to take other curative measures was invited by counsel's own conduct in rejecting the court's proposals. The fact that the defendant sought no relief other than a mistrial cannot aid him. *State v. Hill*, 614 S.W.2d 744, 752 (Mo.App.1981). *See State v. Crawford*, 619 S.W.2d 735, 740 (Mo. 1981); *State v. Williams*, 660 S.W.2d 360, 361 (Mo.App.1983); *State v. Jackson*, 657 S.W.2d 44, 46–47 (Mo.App.1983); *State v. Swingler*, 632 S.W.2d 267, 270 (Mo.App. 1982), holding no error in failing to declare a mistrial under similar circumstances present in this case.

▮▮▮ Other crime evidence also allegedly occurred during the examinations of an arresting officer and Robert DeClue. At one juncture, in reference to the defendant's confession, the officer was asked: "Is this tape about this homicide, Woodrow Wilson Elliott?" During DeClue's testimony, the witness stated that the defendant had committed "some murders." Defendant contends that both of these statements inferred that he was guilty of numerous other killings.

In neither instance was objection raised. As stated previously, failure to raise objection preserves nothing for appeal. *State v. Kenner*, 648 S.W.2d 552, 554 (Mo.App. 1983). And, taken in context, it is illogical to assume that anyone could decipher these isolated statements as references to other crimes.

▮▮▮ Although a review of this complaint may be made under plain error standard, the strength of the state's case is a prime factor in determining whether the error resulted in manifest injustice or a miscarriage of justice. *State v. Hammonds*, 651 S.W.2d 537, 539 (Mo.App.1983). The evidence of guilt in this case was overwhelming—a fact conceded by defendant. Therefore, the trial court's failure to intervene *sua sponte* cannot be viewed as reversible error.

There is no merit in the defendant's other complaints that the prosecutor was permitted to ask leading and repetitive questions throughout the trial.

▮▮▮ As another of his subpoints, defendant asserts that the trial court erred in refusing to order the withdrawal of the assistant prosecuting attorney after the defense endorsed him as a witness. In support of his proposition, the defendant cites D.R. 5–101 and 5–102. Disciplinary Rule 5–102(B) states that if a lawyer learns that he may be called as a witness, "other than on behalf of his client, he may continue the representation until it is apparent that his testimony is or may be prejudicial to his client."

The fact is that the defendant did not call the assistant prosecutor as a witness. There was no violation of the disciplinary rule in the assistant prosecutor's continued representation of the state since there appears no prejudice to the state. And absent some showing of prejudice to the defendant—which there was none—there is no need for reversal.

▮▮▮ Defendant's objection concerning the introduction of photographs of the victim is unavailing. The photographs depicted the victim while he was alive, corroborating testimony about his handicaps. The admission of such demonstrative evidence is within the discretion of the trial court. *State v. Bolder*, 635 S.W.2d 673, 688 (Mo. banc 1982), *cert. denied*, 459 U.S. 1137, 103 S.Ct. 770, 74 L.Ed.2d 983 (1983), and no error appears.

944

▮ Defendant's assertion that it was error to inform the jury of his prior convictions for which he received the death penalty also is denied. This evidence was introduced during the sentencing phase of the trial. "Evidence of other convictions and crimes is appropriate for jury consideration in the second segment of the bifurcated proceedings." *State v. Gilmore*, 661 S.W.2d at 524.

▮ In closing argument the prosecutor noted that the defense counsel had two and one-half years to prepare his case. This was inaccurate, as the counsel who represented the defendant at trial was not the same attorney at the time of his arraignment. Counsel at trial had been on the case about seven months. This inaccuracy, however, is so trivial that no prejudice could have resulted, particularly when counsel was permitted to correct the misstatement. Reversal is not required in every instance in which the prosecutor steps beyond the boundary of proper argument. *State v. Huston*, 599 S.W.2d 69, 71 (Mo. App.1980).

▮ During the sentencing phase of the trial, the prosecutor requested the jury to return the death penalty since the public would expect such punishment if given the opportunity to review the evidence and the defendant's prior conviction record. Defendant contends that this is prejudicial error, but it is not. A prosecutor's argument which merely points to the need for strong law enforcement and infers the effect of the jury's failure to perform its duty is proper. *State v. Olds*, 603 S.W.2d 501, 511 (Mo. banc 1980). It also has been held proper for the prosecutor to ask for a severe penalty as a deterrent to crime if the jury finds the defendant guilty, and it is not reversible error for the prosecutor to tell the jury that the community will be watching the result of the trial. *Id; State v. Laster*, 365 Mo. 1076, 293 S.W.2d 300, 306 (banc 1956), *cert. denied*, 352 U.S. 936, 77 S.Ct. 237, 1 L.Ed.2d 167 (1956). The prosecutor's argument in the instant case fell within allowable limits.

▮ The defendant argues that the state failed to present all of the evidence to which the prosecutor referred in opening statement and that the consequence is reversible error. The mere neglect to set forth some fact mentioned in opening is not prejudicial unless the prosecutor never intended to present the evidence or actually knew he could not support the declaration of proof. *State v. Turner*, 633 S.W.2d 421, 425 (Mo.App.1982). When the issue concerns the trial court's discretion relative to an opening statement, no error requiring reversal will be found if the challenged statement is made in good faith with the reasonable expectation that the evidence will be produced. *State v. Brooks*, 618 S.W.2d 22, 24 (Mo. banc 1981). No bad faith has been demonstrated by the defendant's bare assertions.

III.

In the third of his major points relied on, defendant forwards three allegations of error in the trial court's rulings made during the jury selection process. The first of these is that the trial court excused for cause three prospective jurors who expressed opposition to the death penalty. He argues that the dismissal of these venirepersons violated the constitutional strictures imposed by *Witherspoon v. Illinois*, 391 U.S. 510, 88 S.Ct. 1770, 20 L.Ed.2d 776 (1968).

▮ Two of the three venirepersons in issue initially indicated that they could at least consider the death penalty if so instructed by the judge. But, the qualifications of a prospective juror are not determined conclusively by a single response. They are made on the basis of the entire voir dire examination. *State v. Smith*, 649 S.W.2d 417, 425–426 (Mo. banc 1983), *cert. denied*, 459 U.S. 1114, 104 S.Ct. 262, 78 L.Ed.2d 246 (1983). A reading of the entire voir dire transcript reveals that these prospective jurors eventually voiced strong opposition to the death penalty, stating their inability to vote for the penalty regardless of the evidence that would be advanced at trial. The third venireperson did not indi-

cate that he could even consider the death penalty.

■■■■ Defendant then contends that if the venirepersons indicated that they could not *vote* for the death penalty this was an improper line of inquiry since the *Witherspoon* standard is whether the venireperson could *consider* it. This contention also fails. As the United States Supreme Court expressed in *Witherspoon,* the death penalty could be executed where venirepersons who were excused for cause made it unmistakably clear "that they would automatically *vote* against the imposition of capital punishment without regard to any evidence that might be developed at the trial of the case before them." (emphasis added). 391 U.S. at 522 n. 21, 88 S.Ct. at 1777. In light of the trial court's ability to observe the tenor of the questioning, as well as the reluctance of lay persons to communicate their opinion, the requirements of *Witherspoon* were met. *See State v. Mercer,* 618 S.W.2d 1, 7 (Mo. banc 1981), *cert. denied,* 454 U.S. 933, 102 S.Ct. 432, 70 L.Ed.2d 240 (1981). *See also State v. Preston,* 673 S.W.2d 1 (Mo. banc 1984), and *State v. Guinan,* 665 S.W.2d 325 (Mo. banc 1984), concerning the striking of venirepersons. *Guinan* deals in substantial detail with the application of *Witherspoon.*

Defendant next alleges error in the trial court's refusal to permit voir dire on four issues. The first of these issues concerns the venireperson's ability to impose the death penalty in view of accomplice Leonard Laws' life sentence. Defendant contends that it was error not to permit this inquiry, since the state was allowed to question the jury similarly with respect to Norman Gilmore's 15 year sentence. Both Laws and Norman Gilmore were co-defendants.

■■■■ Disposition of a co-defendant's case normally is not competent evidence. *State v. Clark,* 646 S.W.2d 409, 411 (Mo. App.1983). Evidence of Norman Gilmore's sentence, however, was raised during voir dire, as he was scheduled as a prosecution

witness. It was clear that evidence of Norman's short sentence would be placed before the jury by the defense as impeachment on cross-examination. Laws, on the other hand, was not scheduled to testify. There was no logical rationale for informing the jury of his sentence during voir dire.[5] The trial court has broad supervisory powers in the examination of prospective jurors, *State v. Smith,* 649 S.W.2d at 428, and no abuse of discretion appears concerning this issue.

■■■■ Other inquiries not permitted during jury selection were: 1) whether the death penalty was appropriate in cases other than capital punishment; 2) whether the prospective jurors agreed with abortion; and 3) whether Nazi war criminals deserved the death penalty. None of these questions is relevant. Further, the defendant bears the burden of demonstrating prejudice as a result of the trial court's refusal to permit the inquiry. *State v. Alexander,* 620 S.W.2d 380, 384 (Mo. banc 1981); *McGrath v. State,* 671 S.W.2d 420, 422 (Mo.App.1984). Defendant fails to demonstrate prejudice here.

■■■ Defendant's final attack on the jury selection process is twofold. He contends that it was error not to permit voir dire in individual or small groups. Secondly, he submits that it was error not to permit a second jury for sentencing. Neither of these assertions warrants reversal. The court permitted individual voir dire as the need arose. Clearly, the court has the discretion to control voir dire in this manner. *State v. Guinan,* 665 S.W.2d at 329, and *State v. Yowell,* 513 S.W.2d 397, 403 (Mo. banc 1974), are directly on point on this issue.

■■■ Likewise, there is no constitutional infirmity in Missouri's statutory scheme which provides for a single jury to determine both guilt and sentence in a bifurcated trial. *State v. Preston,* 673 S.W.2d at 9; *State v. Lashley,* 667 S.W.2d 712, 714 (Mo. banc 1984); and *State v. Guinan,* 665 S.W.2d at 330, relate to this.

---

**5.** The jury was informed of Laws' life sentence    during the sentencing phase of trial.

946

## IV.

The final major category raised is an amalgamation of complaints which address the constitutionality of Missouri's death penalty provisions and the proportionality of his sentence.

As to the first of these issues, it is sufficient to refer to this Court's prior decisions which have consistently upheld the death penalty provisions as being constitutional and non-violative of the proscription against cruel and unusual punishment. *See, e.g., State v. Byrd,* 676 S.W.2d 494, 506–07 (Mo. banc 1984); *State v. Laws,* 661 S.W.2d at 531; *State v. Williams,* 652 S.W.2d at 112; *State v. Newlon,* 627 S.W.2d 606 (Mo. banc 1982), *cert. denied,* 459 U.S. 884, 103 S.Ct. 185, 74 L.Ed.2d 149, *reh'g denied,* 459 U.S. 1024, 103 S.Ct. 391, 74 L.Ed.2d 520 (1982).

■■■ Consideration must also be given to the factors indited in §§ 565.012[6] and 565.014,[7] RSMo 1978. Defendant does not contend and the record does not support a finding that the death sentence was imposed under influence of passion, prejudice or any arbitrary factor. The evidence also supports the jury's finding that the killing involved depravity of mind, was "outrageously and wantonly vile and horrible" and that defendant had been convicted of prior felonies. *State v. Preston,* 673 S.W.2d at 10; *State v. LaRette,* 648 S.W.2d 96, 101 (Mo. banc 1983), *cert denied,* 459 U.S. 1114, 104 S.Ct. 262, 78 L.Ed.2d 246 (1983), *reh'g denied,* — U.S. —, 104 S.Ct. 515, 78 L.Ed.2d 702 (1983).

■■■ We also find that the death sentence is not disproportionate to the penalty imposed in similar cases, considering both the crime and defendant. For this latter point, it should be enough to look to *State v. Gilmore,* 661 S.W.2d 519 (Mo. banc 1983), in which the death penalty was upheld against the same defendant for the identical type of crime, albeit defendant did not personally apply the killing blow to the victim. It is evident that defendant's culpability exceeds that of his co-defendants and when combined with his previous criminal history, his sentence of death was imposed properly.

■■■ Norman Gilmore, defendant's brother and co-defendant, turned state's evidence and received a lesser sentence to a reduced charge. But plea agreements are not to be considered in proportionality review. *State v. Laws,* 661 S.W.2d at 532; *State v. Bolder,* 635 S.W.2d 673, 685 (Mo. banc 1982), *cert. denied,* 459 U.S. 1137, 103 S.Ct. 770, 74 L.Ed.2d 983 (1983).

Neither is there basis for the contention that defendant's sentence is disproportionate to that of Leonard Laws who received life without parole for fifty years. Any capital sentencing scheme may occasionally produce an aberrational outcome, *Pulley v. Harris,* — U.S. —, 104 S.Ct. at 881. But that is not so in this instance.

It was the defendant who contrived the pernicious scheme of robbing the handicapped and the elderly and then killing them to prevent later identification. The defendant, not Leonard Laws, selected the victim. The defendant had known Woodrow Wilson Elliott since childhood and was aware that Elliott was helpless, having no legs and only one arm. Further, the evidence strongly suggests that George Gilmore was the fugleman and guiding force in the killing of "Mr. Wilson" (Elliott). It also appears that Laws stabbed the victim

---

**6.** This section was repealed by Laws 1983, S.B. 276 § 1 and replaced by § 565.032, RSMo Cum. Supp.1983. The effective date of S.B. 276 was extended to October 1, 1984, by S.B. 448, 1984 Mo.Leg.Serv. No. 3 at 169.

**7.** This section was repealed by Laws 1983, S.B. 276 § 1 and replaced by § 565.035, RSMo Cum. Supp.1983. The effective date of S.B. 276 was extended to October 1, 1984, by S.B. 448, 1984 Mo.Leg.Serv. No. 3 at 169.

A comparative proportionality review is dictated solely by Missouri statutes and is not constitutionally mandated. *State v. Byrd,* 676 S.W.2d at 507. *See Pulley v. Harris,* — U.S. —, 104 S.Ct. 871, 879, 79 L.Ed.2d 29 (1984).

at the direction of the defendant, and that the other members of the gang truckled at defendant's command. And certainly, the defendant's past criminal record was more extensive than that of Laws. Thus, this case compares with *State v. Guinan, supra* (death penalty for defendant upheld with life sentence for co-defendant), and the amercement was not arbitrarily imposed.

■ Finally, defendant argues that it was error to allow the prosecutor, in closing argument to make reference to the deterrent value of the death penalty after denying funds for Dr. Gilsanin to present evidence to the contrary. Dr. Gilsanin would have testified that the death penalty does not have a deterring effect. It is the substance of defendant's argument that Dr. Gilsanin was allowed to testify for Leonard Laws, who received life rather than death, and that such testimony may have been the lifesaving touch.

Defendant's argument is unpersuasive. The prosecutor's remark regarding deterrence was limited to his argument. No evidence on this matter was introduced by the state, so Dr. Gilsanin was not needed to counter any state's evidence.

The issue regarding the state's obligation to provide public funds for witnesses for defendant has already been treated. It is not so obliged. *State v. Holland, supra; State v. Woods, supra.*

The fact is that there are qualitative differences between Laws' and defendant's past conduct and defendant's guiding hand through a series of heinous and lupine crimes against those cruelly trapped by age or physical handicap. The argument that the sentencing outcome of the *Laws* case hinged solely on the theoretical assertion of one witness is too speculative and frail to have substance to resist the force of logic.

Judgment affirmed.

All concur.