

# SUPREME COURT OF MISSOURI
## en banc

|  |  |  |
|---|---|---|
| STATE OF MISSOURI, | ) | |
| | ) | |
| Respondent, | ) | |
| | ) | |
| v. | ) | No. SC95110 |
| | ) | |
| DANIEL HARTMAN, | ) | |
| | ) | |
| Appellant. | ) | |

**APPEAL FROM CIRCUIT COURT OF JASPER COUNTY**
Honorable Gayle L. Crane, Judge

*Opinion issued March 15, 2016*

Following a jury trial, Daniel Hartman (hereinafter, "Hartman") was found guilty of second-degree murder, section 565.021, RSMo 2000,[1] armed criminal action, section 571.015, and first-degree burglary, section 569.160.  The trial court sentenced Hartman to concurrent terms of life imprisonment for second-degree murder, life imprisonment for armed criminal action, and fifteen years' imprisonment for first-degree burglary. Hartman appeals.

Hartman claims that his due process rights were violated during the penalty phase of his trial because the trial court excluded reliable witness testimony, which could have provided a basis for him to be exonerated.  Further, Hartman asserts that during closing argument, the state's request for the jury to draw an adverse inference from the omission

---

[1] All further statutory references are to RSMo 2000, unless otherwise indicated.

of the excluded evidence was erroneous. This Court finds that excluding the evidence violated Hartman's due process rights. Accordingly, the trial court's judgment is vacated, and the case is remanded.

## Factual and Procedural Background

On the night of July 5, 2012, J.W. (hereinafter, "Victim"), a known drug supplier, was shot in his home and killed from a single gunshot wound to the chest. While investigating Victim's death, the police discovered that Victim's wound was not from a contact or close-range shot. They found only three bullets in the home: one that killed Victim, one in the wall, and one in the floor. The police's subsequent investigation of the events and people surrounding Victim's homicide resulted in varied and inconsistent statements. Eventually, the state charged Hartman, Jonathan Taylor (hereinafter, "Jonathan"), Elijah Taylor (hereinafter, "Elijah"),[2] Marcus Stephens (hereinafter, "Marcus"), and Cody Stephens (hereinafter, "Cody")[3] in connection with Victim's homicide.

Viewing the facts in the light most favorable to the judgment, the events surrounding the night of July 5, 2012, are as follows: Cody visited the apartment of his friend Jonathan, and Jonathan's pregnant girlfriend in Joplin, Missouri. When Cody arrived, Hartman and Marcus were present. The group drank alcohol, used drugs, and eventually decided they needed to rob Victim.

---

[2] Jonathan and Elijah are brothers.
[3] Due to the repetition of surnames of the parties involved, Cody Stephens and Marcus Stephens, as well as brothers Jonathan Taylor and Elijah Taylor, will all be referred to by their first names. No disrespect is intended.

Jonathan called Travis Morris (hereinafter, "Morris"). Morris stated that he could obtain access for Jonathan and determine who was presently in Victim's house. Twenty minutes later, Morris called Jonathan to inform him that Victim and his girlfriend were sleeping inside the house. Morris and Paul Pena (hereinafter, "Pena") went to Jonathan's apartment.

Then all of the men, except Cody,[4] went to Victim's house.[5] Morris informed the group that Victim had an assault rifle in the house and that Victim knew karate or kickboxing. The men discussed taking cash and drugs from Victim. Jonathan did not want to enter Victim's house at this time because he was acquainted with Victim.

Hartman, Elijah, Marcus, and Morris approached Victim's front door and knocked. There was no answer. Then the group went to the back door. They wanted to break in, but no one in the group wanted to kick the door down. So, they all returned to Jonathan's apartment.

Upon returning to Jonathan's apartment, Jonathan woke Cody, seeking his assistance in breaking into Victim's house. Jonathan wanted Cody to join the group not only for his assistance but also so that he would be involved and would not "rat out" anyone. The group then drove in two cars to a parking lot near Victim's home. Cody stated that both Hartman and Elijah had guns with them. Cody further explained that the gun Hartman carried was Jonathan's. Jonathan, Elijah, Cody, Hartman, and Marcus walked to Victim's home. There was conflicting testimony regarding who kicked in the

---

[4] There was conflicting testimony regarding whether Cody was part of this group.
[5] Elijah testified that Jonathan did not want go because he knew Victim, but later admitted Jonathan came with the group but remained in the car.

back door, but either Hartman, Cody, or Elijah kicked in the back door, and everyone went inside.

Inside, Victim and his girlfriend were sleeping. There are conflicting recollections as to whether Victim merely woke when the group entered his room or whether Hartman and Elijah woke Victim, telling him to give them cash and drugs. Victim got up, stretched, and walked toward them. Victim was shot. Marcus testified that he took Victim's rifle and that after he walked away from Victim's bedroom, he heard six or seven gunshots. Cody believed that Harman and Elijah fired their weapons.

The group returned to Jonathan's apartment. Everyone claimed to have shot Victim. Hartman claimed that had he realized Victim's girlfriend was present, he would have shot her too. Hartman and Elijah were upset the group did not take anything from Victim's house and wanted everyone else to return.

Cody, Jonathan, Elijah,[6] and Pena returned to Victim's house. Hartman remained behind in Jonathan's apartment. Cody, Jonathan, and Elijah went back inside the house, ransacking it while Victim's girlfriend slept.

Harman was charged by information with first-degree murder, armed criminal action, and first-degree burglary. At trial, Cody testified pursuant to a plea agreement in which he pleaded guilty to second-degree murder and first-degree burglary with a fifteen-year cap, but hoped for less than fifteen years' imprisonment based upon his cooperation. Elijah testified pursuant to the same plea agreement with the same anticipation for a reduced sentence. Jonathan was subpoenaed to testify, but the state stipulated he was

---

[6] Elijah denied returning to Victim's home a third time.

4

unavailable for trial and would refuse to testify by invoking his Fifth Amendment rights. Defense counsel sought to call Harlin King (hereinafter, "King") to testify regarding Jonathan's statements to him immediately following Victim's death. The state objected to King's testimony, claiming that it was inadmissible hearsay. The trial court sustained the state's objection, but it allowed Hartman to make an offer of proof, which would show that Jonathan confessed to shooting Victim. Hartman did not testify during the guilt phase of his trial. Hartman's counsel argued in closing that the witnesses were not honest about the identity of the shooter, and they were covering for Jonathan, their brother and friend. The jury found Hartman guilty of first-degree murder, armed criminal action, and first-degree burglary.

During the penalty phase, Hartman testified. Hartman maintained he did not cause Victim's death and he was not present at Victim's house. When the jury was unable to agree on a sentence of life imprisonment without the possibility of probation or parole, the trial court vacated the jury's verdicts for first-degree murder and armed criminal action and found Hartman guilty of second-degree murder under section 565.021.1(1), and armed criminal action in connection with second-degree murder.[7] The trial court sentenced Hartman to concurrent terms of life imprisonment for second-degree murder, life imprisonment for armed criminal action, and fifteen years' imprisonment for first-degree burglary.

---

[7] The trial court took this course of action to be in accord with *State v. Hart*, 404 S.W.3d 232 (Mo. banc 2013), because Hartman was under the age of eighteen at the time of the offenses.

5

Hartman appeals his conviction and sentence. After an opinion by the court of appeals, the case was transferred to this Court. Mo. Const. art. V, sec. 10.

**Exclusion of testimony**

Hartman asserts the trial court abused its discretion and committed reversible error in excluding King's testimony because Jonathan admitted to King that he shot Victim. Hartman believes this was not inadmissible hearsay because the testimony would have been an admission against interest made to one of Jonathan's close friends, shortly after the murder, and it was sufficiently reliable. Further, Hartman argues that the exclusion of this testimony violated his due process rights.

A trial court "has broad discretion to admit or exclude evidence during a criminal trial, and error occurs only when there is a clear abuse of this discretion." *Hart*, 404 S.W.3d at 248. "Reversal due to an evidentiary error requires a showing of prejudice." *State v. McFadden*, 369 S.W.3d 727, 736 (Mo. banc 2012) (quoting *State v. Taylor*, 298 S.W.3d 482, 492 (Mo. banc 2009)). If there is a reasonable probability that the trial court's error affected the outcome of the trial, there is prejudice. *State v. Clark*, 364 S.W.3d 540, 544 (Mo. banc 2012).

Hearsay statements, or out-of-court statements used to prove the truth of the matter asserted, generally are inadmissible. *State v. Blankenship*, 830 S.W.2d 1, 6 (Mo. banc 1992). Yet, there is a recognized constitutionally-based hearsay exception in the due process clause founded upon *Chambers v. Mississippi*, 410 U.S. 284, 93 S. Ct. 1038, 35 L.Ed.2d 297 (1973). This narrow exception applies to out-of-court statements that exonerate the accused and are "originally made and subsequently offered at trial under

6

circumstances providing considerable assurance of their reliability." *Id*. at 300. The Supreme Court set forth three indicators of reliability. *Blankenship*, 830 S.W.2d at 7. First, the confession "was made spontaneously to a close acquaintance shortly after" the crime occurred. *Chambers*, 410 U.S. at 300. Second, the confession "was corroborated by some of the evidence in the case …." *Id*. Finally, the confession was made "in a very real sense self-incriminatory and unquestionably against interest." *Id*. at 301.

Prior to the commencement of Hartman's trial, the state filed a motion *in limine* to exclude King's statements that Jonathan told him that Jonathan shot Victim three times. The state asserted King's testimony would be inadmissible as hearsay and the testimony would not violate Hartman's due process rights. The trial court sustained the state's objection. At trial, Hartman again requested King to testify, and the state again objected. Thereafter, Hartman made an offer of proof by calling King to testify.

During this offer of proof, King testified that he knew Jonathan from school and saw him on a regular basis. They communicated by cellular telephone calls and text messages. On the night of the murder, beginning around 2 or 3 a.m., Jonathan began calling King twenty to thirty times, wanting King to pick him up. King finally answered a telephone call and spoke with Jonathan. King then picked up Jonathan and another person, and he took them to a store. King testified that Jonathan was "just freaking out" and really scared. While they were driving around, Jonathan told King that the robbery "went wrong" and he shot a guy three times "because he was getting out of bed or something." While King expressed doubts regarding whether Jonathan actually shot

7

someone, King still went to the police with this information because King did not think it was right to be able to kill another person.

King's proposed testimony meets the three indicators of reliability. The first indicator is whether the confession was made to a close acquaintance and spontaneously shortly after the crime occurred. *Chambers*, 410 U.S. at 301. "A statement, particularly an admission to a crime, made to someone of long-standing and confidential relationship is more likely to be trustworthy." *State v. Guinn*, 58 S.W.3d 538, 545 (Mo. App. W.D. 2001); *see also State v. Rogers*, 758 S.W.2d 199, 201 (Mo. App. E.D. 1988) (suggesting that trustworthiness of the statements requires the speaker to have a neutral interest toward the defendant).

The offer of proof showed King and Jonathan were friends. They saw each other at school and, when Jonathan was not incarcerated, saw each outside of school regularly. They communicated through telephone calls and text messages, and they played basketball together. *Cf. State v. Carroll*, 629 S.W.2d 483, 485-86 (Mo. App. W.D. 1981) (finding trial court erred in excluding evidence that someone other than the defendant committed the robbery in the underlying criminal proceedings when that information was communicated to a cellmate) and *State v. Phillips*, 940 S.W.2d 512, 517-18 (Mo. banc 1997) (finding reliability of statements made spontaneously to a person who was not a close friend at a social gathering should have been admitted in a penalty phase of trial). Further, King has no relationship with Hartman, thereby creating a presumption of neutrality toward Hartman's fate at trial.

8

Jonathan's confession was made spontaneously to King shortly after the murder occurred. Jonathan telephoned King twenty to thirty times within hours of the murder. When King answered Jonathan's telephone call and spoke with him, King stated that Jonathan was "freaking out," "scared," and confessed to killing Victim. Because the confession was made spontaneously to a close friend and shortly after the murder occurred, the first reliability indicator is met.

The second indicator is whether the confession "was corroborated by some of the evidence in the case …." *Chambers*, 410 U.S. at 301. There was independent evidence submitted at trial corroborating the statements Jonathan made to King.

Here the offer of proof demonstrated that King stated that Jonathan appeared to be "freaking out" and very scared when they spoke shortly after the murder. Jonathan then told King that in an attempt to obtain drugs, "they" went in but the robbery went wrong. Jonathan stated that he shot at Victim as he was getting out of bed. Jonathan also told King that he fired three shots at Victim and killed Victim.

Jonathan's statements to King were corroborated at trial. One witness placed Jonathan at the scene of the crime. *See State v. Boyd*, 992 S.W.2d 213, 218 (Mo. App. E.D. 1999) (distinguishing the corroborating evidence indicia when there was no evidence in placing the declarant at the scene of the crime) and *State v. Blackman*, 875 S.W.2d 122, 142 (Mo. App. E.D. 1994) (same). There was testimony that the robbery was not successful; the group failed to obtain the drugs or money they sought. Victim was shot when he got out of bed. Jonathan stated he fired three shots, and only three bullets were recovered from the scene. The information Jonathan provided to King

9

mirrored the state's evidence in every respect except the identity of the shooter. Accordingly, the second indicator of reliability is satisfied.

The final indicator of reliability is whether the confession was made "in a very real sense self-incriminatory and unquestionably against interest." *Chambers,* 410 U.S. at 301. In making this determination, it is important to determine whether the statements made were inculpatory. *State v. Jackson*, 248 S.W.3d 117, 126 (Mo. App. S.D. 2008). Jonathan's confession to King was self-incriminatory and against his interest in that Jonathan stated he was the person who shot and killed Victim. Further, Jonathan implicated himself as the only shooter in that he stated he fired three shots, and the police only recovered three bullets from the crime scene. Jonathan's statements implicate only himself as committing Victim's murder.

King's proposed testimony met the three indicators of reliability, and the trial court erred in failing to allow this testimony at trial. In *State v. Turner*, 623 S.W.2d 4, 9 (Mo. banc 1981), cert. denied, 456 U.S. 931, 102 S. Ct. 1982, 72 L.Ed.2d 448 (1982), superseded by statute on other grounds as recognized in *State v. Wheat*, 775 S.W.2d 155 (Mo. banc 1989), this Court found that "where substantial indicia of reliability appear and declarant's complicity if true would exonerate the accused, declarant's averments against an interest penal in nature may not be excluded …." Because King's testimony met the indicia for reliability, it must be admitted if it would exonerate Hartman.

Hartman was tried for first-degree murder. To be found guilty of first-degree murder, one must "knowingly cause[] the death of another person after deliberation upon

10

the matter." Section 565.020.1. Hartman was not charged with accomplice liability for first-degree murder.

Hartman never admitted to any participation in any part of the underlying crime in this case. Had King's testimony been introduced, the jury could have believed King, rather than the other co-defendants and Jonathan's girlfriend, who testified against Defendant. Each co-defendant hoped for a reduced sentence for cooperating with the state, and one of the co-defendants was Jonathan's brother. Jonathan's girlfriend was pregnant with his child. Each of the state's witnesses had a reason to implicate someone other than Jonathan as Victim's killer.

The dissent asserts that Hartman was not prejudiced by the exclusion of King's testimony because Marcus testified that Elijah, Cody, and Jonathan each claimed to have shot Victim. In response to a question about who said they shot Victim, Marcus replied, "Eli[jah], Cody and Jonathan." Similarly, the dissent states that Copeland testified that Elijah told her "*we* killed him." (Emphasis added.) In support of its analysis, the dissent cites two cases to state Jonathan's confession to King properly was excluded at trial.

First, the dissent relies upon *State v. Gilmore*, 681 S.W.2d 934, 940 (Mo. banc 1984), for the proposition that Hartman was not harmed by the exclusion of King's testimony because the jury received the "gist of the testimony." Further, the dissent claims even if there were prejudice in excluding these questions, there was no prejudice. *Gilmore* is inapposite to this case. The Court in *Gilmore* was addressing three discrete instances during cross-examination of two witnesses wherein the trial court disallowed "repetitive, improperly phrased or argumentative" questions; it was not in response to

11

excluding a witness who would have testified to a substantially different factual scenario. *Id.*

Second, the dissent references *State v. Wells*, 305 S.W.2d 457, 459 (Mo. 1957). In *Wells*, the trial court sustained an objection during cross-examination "of the prosecuting witness [as to] whether she had commenced to have her monthly periods about four years previous to the time of trial." *Id*. at 458. The dissent cites *Wells*, stating that the "improper rejection of evidence is not prejudicial error when the same or substantially the same evidence is otherwise admitted." Accordingly, from this one sentence, the dissent seeks the reader to infer that there was ample evidence regarding the statements of the other co-defendants admitting to shooting Victim. However, the *Wells* Court's analysis continued:

> This is the rule whether such evidence is admitted prior or subsequent to such rejection, and it finds its most frequent application where the same or substantially the same evidence as that excluded is elicited *from the same witness*. In this case counsel for defendant had asked the prosecuting witness several questions on the same subject, including the question, 'And you have been having that about four years, haven't you?' to which the witness answered, 'No, not quite.' It is evident that the witness had already answered substantially the same question, and the answer was before the jury without objection.

*Id*. (internal citation omitted and emphasis added).

When compared to the instant case, citation to the isolated statement from *Wells* is misguided. The *Wells* Court addressed repeated questioning of one witness regarding information to which the witness had already provided. There is no corollary to the complete exclusion of a witness who could provide testimony that was not addressed or

12

mentioned by any other witness at trial. Again, *Wells* is inapposite to the present circumstances.

Here, there was clear evidence presented by the state that there was only one shooter. While there could be collective criminal responsibility, only one of the people present would have been able to pull the trigger, killing Victim. Marcus failed to indicate one shooter. Elijah's use of the collective pronoun "we" does not assist the jury in identifying the actual shooter. King's testimony would have been the only evidence that a single person, other than Hartman, was the shooter; his confession should have been introduced into evidence.

King's testimony would have provided evidence from which the jury could have exonerated Hartman of first-degree murder, based upon another co-defendant's confession. The jury then could have found that the evidence presented by the state was insufficient to find Hartman guilty of first-degree murder beyond a reasonable doubt. "All decisions as to what evidence the jury must believe and what inferences the jury must draw are left to the jury …." *State v. Jackson*, 433 S.W.3d 390, 399 (Mo. banc 2014). Because King's proposed testimony met the indicia of reliability and could exonerate Hartman, the trial court abused its discretion in excluding it.

## Conclusion

In this case, the omission of King's testimony impinged upon Hartman's due process rights. The trial court erred in excluding this potentially exculpatory testimony, and Hartman was prejudiced thereby. Accordingly, Hartman's convictions for second-

13

degree murder, armed criminal action, and first-degree burglary are vacated, and the case is remanded.

The dissent raises the specter of Hartman being retried and facing potentially a more onerous sentence because he is no longer a juvenile. However, the dissent fails to acknowledge that the protections for harsh sentences apply when a defendant is a juvenile at the time of the offense rather than at the time of sentencing.

In *Miller v. Alabama*, 567 U.S. --, 132 S. Ct. 2455, 2464, 183 L. Ed. 2d 407 (2012), the Supreme Court concluded that "mandatory life-without-parole sentences for juveniles violate the Eighth Amendment." The Court's concerns focused upon "children's diminished culpability and heightened capacity for change." *Id*. at 2469. The Supreme Court also reflected that the harshest penalty would rarely be applicable, but it did not "foreclose a sentencer's ability to make that judgment in homicide cases, [and] we require it to take into account how children are different, and how those differences counsel against irrevocably sentencing them to a lifetime in prison." *Id*. This Court then applied *Miller* in *State v. Hart*, 404 S.W.3d 232 (Mo. banc 2013). This Court reversed and remanded the defendant's sentence of life without parole for first-degree murder as it violated the Eighth Amendment for a defendant who was *a juvenile at the time of the offense*. *Hart*, 404 S.W.3d at 235 (Emphasis added).

This Court need not address Hartman's remaining point on appeal, which addressed the alleged error by the state urging the jury to draw an adverse inference from the omission of King's testimony during closing argument. This claim of error will not necessarily reoccur upon remand and, hence, it will not be mused upon. *State v.*

14

*Wacaser*, 794 S.W.2d 190, 196 (Mo. banc 1990). This Court will not issue an advisory opinion. *State v. Swiggart*, 458 S.W.2d 251, 252 (Mo. 1970).

The trial court's judgment is vacated, and the case is remanded.


_____
GEORGE W. DRAPER III, JUDGE

Breckenridge, C.J., Stith, Teitelman and Russell, JJ., concur; Wilson, J., dissents in separate opinion filed; Fischer, J., concurs in opinion of Wilson, J.



# SUPREME COURT OF MISSOURI
## en banc

|  |  |  |
|---|---|---|
| STATE OF MISSOURI, | ) | |
| | ) | |
| Respondent, | ) | |
| | ) | |
| v. | ) | No. SC95110 |
| | ) | |
| DANIEL HARTMAN, | ) | |
| | ) | |
| Appellant. | ) | |

### DISSENTING OPINION

I respectfully dissent. The principal opinion correctly notes that "[r]eversal due to an evidentiary error requires a showing of prejudice." *State v. McFadden*, 369 S.W.3d 727, 736 (Mo. banc 2012) (quoting *State v. Taylor*, 298 S.W.3d 482, 492 (Mo. banc 2009)). There was no prejudice from the trial court's exclusion of Mr. King's testimony concerning Jonathan's out-of-court inculpatory statement because evidence that Jonathan was the shooter already was before the jury. Marcus Stephens, offered by the defense, testified that Eli, Cody **and Jonathan** each claimed to have shot the Victim. *See State v. Gilmore*, 681 S.W.2d 934, 940 (Mo. banc 1984) ("even if there had been error in sustaining objections to these isolated questions, the court's rulings were not prejudicial to the defendant" because the jury otherwise "received the gist of the testimony that the defense counsel attempted to develop"); *State v. Wells*, 305 S.W.2d 457, 459 (Mo. 1957)

("improper rejection of evidence is not prejudicial error when the same or substantially the same evidence is otherwise admitted"). Moreover, Ms. Copeland testified that Eli boasted the Victim "was dead … and we killed him." As a result, the defense had ample grounds to argue to the jury that Jonathan or someone else – not Hartman – was the shooter, and it did not do so.

Even if Jonathan's out-of-court inculpatory statement had not already been before the jury, that statement did not exonerate Hartman of murder in the first degree. Had that evidence come in – and had it been argued to the jury by defense counsel, even though Mr. Stephens' and Ms. Copeland's evidence was not – the state would have been entitled to have the jury instructed that Hartman could be convicted of first-degree murder as a principal or as an accomplice. *See State v. Cella*, 32 S.W.3d 114, 118 (Mo. banc 2000) ("It is proper to submit to the jury a theory of accomplice liability despite charging the defendant as a principal."); *State v. Isa*, 850 S.W.2d 876, 898 (Mo. banc 1993) (same).

Finally, prejudice should be measured against Hartman's conviction for second-degree murder, not the jury's guilty verdict for first-degree murder, which the trial court vacated under *State v. Hart*, 404 S.W.3d 232, 239 (Mo. banc 2013). As above, if King's testimony about Jonathan's inculpatory statement had come in – and had it been argued to the jury, which the other evidence of Jonathan's inculpatory statements was not – the state would have been entitled under *Cella* and *Isa* to have the jury instructed that Hartman could be convicted of second-degree murder as a principal or as an accomplice.

2

In this regard, it is significant that the jury actually was instructed – if it did not find Hartman guilty of first-degree murder – that it should consider whether Hartman was guilty of second-degree felony murder. Instruction No. 8 stated that the jury should find Hartman guilty of second-degree murder if: (1) Hartman committed burglary in the first degree; (2) Hartman "***or an accomplice*** caused the death of [Victim] by shooting him;" and (3) Victim "was killed as a result of the perpetration of that burglary in the first degree." [Emphasis added.]

For the exclusion of King's testimony to be prejudicial, therefore, this Court must conclude – if Jonathan's out-of-court statement had been admitted – that the jury would not have found Hartman guilty of first-degree murder as a principal or accomplice (a doubtful proposition), that the jury would not have found Hartman guilty of regular second-degree murder as a principal or accomplice (a far more doubtful proposition), and that the jury would not have found Hartman guilty of second-degree felony murder (an impossible proposition). Under this Court's decision, however, Hartman now faces re-trial for first-degree murder – and a possible sentence of life without parole[1] – with no reasonable prospect of bettering the outcome of his first trial, i.e., a conviction for

---

[1] In his first trial, the jury found Hartman guilty of murder in the first degree. But, because the jury was unable to agree to impose the only statutorily authorized sentence, i.e., life without parole, the trial court entered a conviction of second-degree murder and the jury assessed his sentence for that crime. On retrial, Hartman will face the same first-degree murder charge and – if the jury finds he committed that crime – the trial court must again ask the jury whether a sentence of "life without parole is a just and appropriate sentence … under all the circumstances." *Hart*, 404 S.W.3d at 239.

3

second-degree murder.  Accordingly, I respectfully dissent and would affirm Hartman's convictions in all respects.

_____
Paul C. Wilson, Judge