STATE of Missouri, Respondent,

v.

**Laron HART, Appellant.**

No. SC 93153.

Supreme Court of Missouri, En Banc.

July 30, 2013.

Gwenda R. Robinson, Public Defender's Office, St. Louis, for Hart.

Evan J. Buchheim, Attorney General's Office, Jefferson City, for the State.

PAUL C. WILSON, Judge.

Mr. Hart was 17 years old when he shot and killed his victim during the second of two robberies he committed on the evening of January 24, 2010. The jury found Hart guilty of first-degree murder, first-degree robbery, and two counts of armed criminal action. Hart waived jury sentencing prior to trial pursuant to section 557.036.4(1),[1] and the trial court sentenced him to life in prison without the possibility of parole for murder and to concurrent 30–year sentences for each of the three non-homicide crimes.

Hart appeals only his convictions for first-degree murder and armed criminal action in connection with first-degree murder. He challenges the use of his videotaped interrogation at trial and claims that his sentence of life without parole violates the Eighth Amendment. Finally, because he claims that the only authorized sentences for first-degree murder are uncon-stitutional as applied to juvenile offenders, Hart argues that section 565.020 is void for failure to provide a valid punishment. Hart's evidentiary claims lack merit, but his latter claims must be addressed in detail in light of recent changes in Eighth Amendment jurisprudence.

On June 25, 2012, while Hart's appeal was pending, the United States Supreme Court announced its decision in *Miller v. Alabama*, —— U.S. ——, 132 S.Ct. 2455, 2469, 183 L.Ed.2d 407 (2012), that the Eighth Amendment forbids sentencing a juvenile defendant to life without parole when there has been no consideration of the particular circumstances of the crime or the offender's age and development. "By making youth (and all that accompanies it) irrelevant to imposition of that harshest prison sentence, such a scheme poses too great a risk of disproportionate punishment." *Id. Miller* does not hold that a juvenile never can receive this sentence for first-degree murder. It holds only that life without parole may not be imposed unless the sentencer[2] is given an opportunity to consider the individual facts

---

1. Unless otherwise noted, the statutes cited herein are those in effect on the date of this opinion and found either in RSMo 2000 or the 2012 supplement thereto.

2. The United States Supreme Court uses the term "sentencer" in *Miller* to refer to whichever entity (i.e., the judge or jury) has the responsibility under state law to determine a defendant's sentence. *Miller*, 132 S.Ct. at 2469 ("a sentencer needed to examine all these circumstances before concluding that life without any possibility of parole was the appropriate penalty"). This Court uses the same term. *See, e.g., Deck v. State*, 381 S.W.3d 339, 344 (Mo. banc 2012) (in first-degree murder cases, the "sentencer must consider the character and record of the defendant and the circumstances of the particular offense"). Under section 557.036.3, the responsibility for "assessing and declaring" a defendant's punishment in Missouri rests with

the jury, unless the defendant waives this procedure or the state proves beyond a reasonable doubt that the defendant is a repeat offender in one of the categories excluded by section 557.036.4(2). After the jury makes this determination (and in all cases when jury sentencing is not applicable or the jury is unable to agree), the trial court imposes a sentence (within the statutorily approved range of punishments) that is appropriate under all the circumstances. In doing so, however, the trial court may not impose a greater sentence than the punishment assessed and declared by the jury (provided it was within the authorized range) and, if the jury assesses and declares a punishment below the lawful range, the trial court must impose the minimum lawful sentence. As used in this opinion, therefore, the phrase "jury sentencing" refers to the procedure authorized by section 557.036.3, and the term "sentencer" is used

and circumstances that might make such a sentence unjust or disproportionate.

Hart's sentence of life without parole for first-degree murder violates the Eighth Amendment because, as in *Miller*, it was imposed with no individualized consideration of the myriad of factors discussed in the *Miller* decision. Accordingly, Hart must be re-sentenced in accordance with *Miller's* constitutional safeguards requiring the sentencer to consider whether a sentence of life without parole is just and appropriate in light of Hart's age and the other circumstances surrounding his offense.[3]

On remand, if the sentencer conducts the individualized assessment required by *Miller* and is persuaded beyond a reasonable doubt that sentencing Hart to life in prison without parole is just and appropriate under all the circumstances, the trial court must impose that sentence.[4] If the sentencer is not persuaded that this sentence is just and appropriate, section 565.020 is void as applied to him because it fails to provide a constitutionally permissible punishment. In that event, Hart cannot be convicted of first-degree murder and the trial court must find him guilty of second-degree murder instead. In addition, the trial court must vacate Hart's conviction for armed criminal action that was predicated on Hart being guilty of first-degree murder and, instead, find Hart guilty of armed criminal action in connection with that second-degree murder. Finally, Hart must be sentenced for these two crimes within the applicable statutory punishment ranges.

## I. Facts

Hart does not challenge the sufficiency of the evidence to support his convictions. Viewing the evidence at trial in the light most favorable to the verdict, the Court presumes that the jury found the following facts.

Shortly before 9:00 p.m. on January 24, 2010, Ms. Hellrich was entering her car when Hart pulled the car door open and demanded her purse. Ms. Hellrich first tried to hand over only her wallet but, after Hart pulled out a handgun, she surrendered her purse as well. Hart ran back to the stolen blue Cutlass he had arrived in and sped off. Shaken but not injured, Ms. Hellrich quickly called the police.

A short time later and only a short distance away, Hart again jumped from the blue Cutlass and approached Mr. Sindelar from behind. When Hart grabbed the man's backpack, Mr. Sindelar began to struggle and yell for help. Hart pulled out a gun and fired a single, fatal shot into Mr.

---

to acknowledge the fact that, as discussed below, Hart is entitled to jury sentencing on remand unless he files a new waiver pursuant to section 557.036.4(1).

**3.** Because *Miller* was decided while Hart's first-degree murder conviction was on direct appeal (and, therefore, not yet final), the state concedes that *Miller* is applicable to this case. This Court has not yet addressed whether *Miller* should be applied to the scores of similar cases that were final before *Miller* was decided. Accordingly, nothing herein should be taken as expressing any view on that question or, if *Miller* is applicable to such cases,

what relief (if any) *Miller* requires and under what circumstances.

**4.** Even though section 557.036.5 permits the trial court to impose a lesser sentence than the one chosen by the jury under section 557.036.3, this provision does not allow the trial court to reject a sentence of life without parole after the jury determines that it is just and appropriate under *Miller*. The trial court only may impose a sentence that is authorized by law and, as discussed below, the only sentence authorized by section 556.020 when a juvenile is found guilty of first-degree murder is life without parole.

Sindelar's chest. Hart ran back to the blue Cutlass, leaving Mr. Sindelar to die.

The next morning, police stopped the blue Cutlass following a protracted chase through rush-hour traffic. Hart was not in the car, but Ms. Hellrich's belongings were found in the car and in the pockets of one of the occupants. Based on the descriptions given by Ms. Hellrich and a witness to Mr. Sindelar's murder, the police soon arrested Hart. Both Ms. Hellrich and the eyewitness identified Hart in a police lineup. After being read his rights, Hart acknowledged receiving and understanding those rights and signed a waiver agreeing to be questioned without counsel present. During the subsequent videotaped interrogation, Hart initially denied any involvement in the robberies. When confronted with the evidence against him, however, including the results of the lineup, Hart soon admitted—albeit in stages— to being present at both robberies, to knowing that the robberies would occur before they did, to being outside the car and near the victims during both robberies, and to watching an accomplice shoot Mr. Sindelar. Hart maintained throughout the interrogation that he did not shoot Mr. Sindelar.

At trial, Hart argued that the incriminating statements he made during the videotaped interrogation were coerced and, instead, offered alibi evidence that he claimed proved he was not involved in either robbery. The jury rejected this evidence and found Hart guilty of first-degree robbery and armed criminal action for the robbery of Ms. Hellrich, and first-degree murder and armed criminal action for the murder of Mr. Sindelar. To be clear, Hart's murder conviction was not based on felony murder or any theory of accomplice liability. Instead, the jury concluded—unanimously and beyond a reasonable doubt—that Hart killed Mr. Sindelar knowingly and deliberately, after cool reflection on the matter.

Hart had waived jury sentencing prior to trial pursuant to section 557.036.4(1) and, by doing so, chose to have the trial court decide his punishments if the jury found him guilty of any of the charges. At the beginning of Hart's sentencing hearing, the trial court stated that it had not ordered a sentencing assessment report because, "as to [the first-degree murder conviction], the court's limited as to what it could impose by way of sentence." The trial court was referring to the fact that, because Hart was not eligible for the death penalty due to his age, *see Roper v. Simmons*, 543 U.S. 551, 125 S.Ct. 1183, 161 L.Ed.2d 1 (2005) (death penalty categorically prohibited for juvenile offenders), the only other punishment for first-degree murder authorized by section 565.020.2 was life in prison with no possibility of parole. At the conclusion of the sentencing hearing, the trial court sentenced Hart to life without parole for first-degree murder and to concurrent 30–year sentences for the first-degree robbery and the two armed criminal action charges.

Hart appealed his convictions for first-degree murder and armed criminal action to the court of appeals. Because Hart argues that section 565.020 is invalid under *Miller*, the state moved to transfer Hart's appeal to this Court pursuant to article V, section 11 of the constitution. The court of appeals ordered transfer, and this Court has jurisdiction. Mo. Const. art. V, secs. 3 and 11.

## II. The *Miller* Decision

Hart was found guilty of first-degree murder under section 565.020, which provides:

1. A person commits the crime of murder in the first degree if he knowingly

causes the death of another person after deliberation upon the matter.

2. Murder in the first degree is a class A felony, and *the punishment shall be either death or imprisonment for life without eligibility for probation or parole,* or release except by act of the governor; except that, if a person has not reached his sixteenth birthday at the time of the commission of the crime, the punishment shall be imprisonment for life without eligibility for probation or parole, or release except by act of the governor.

§ 565.020, RSMo 2000 (emphasis added).

The language of section 565.020.2 is plain and unambiguous: Because Hart was 17 years old at the time he committed this murder, the sentencer was required to sentence him to "either death or imprisonment for life without eligibility for probation or parole[.]" Under *Roper,* however, Hart cannot be sentenced to death because the Eighth Amendment prohibits the death penalty for defendants who commit first-degree murder at age 17 years or younger. Accordingly, as the trial court expressly noted, life without parole is the only statutorily authorized punishment under section 565.020.2 available when a juvenile commits first-degree murder.[5]

Hart maintains that *Roper* categorically bars juvenile offenders from being sentenced to death, and he claims that *Miller* reaches the same conclusion with respect to life sentences without parole. He contends, therefore, that both of the punishments authorized by section 565.020.2 have been declared unconstitutional for all juvenile offenders. Claiming that a criminal statute must provide at least one valid punishment, Hart concludes that section 565.020 is void as applied to juvenile offenders and, therefore, he cannot be convicted under that statute. Hart requests, instead, that he be found guilty of second-degree murder and sentenced for that crime.[6]

Hart's first premise, i.e., that a criminal statute that fails to provide a valid punishment is void, is unquestionably correct. *See State v. Harper,* 510 S.W.2d 749, 750 (Mo.App.1974) (collecting cases). It is equally certain, however, that Hart's second premise is incorrect. Unlike *Roper's* unqualified prohibition against sentencing a juvenile offender to death, *Miller* does not categorically bar sentencing a juvenile offender who commits first-degree murder to life without parole. Instead, *Miller* holds that such a sentence is constitutionally permissible as long as the sentencer

**5.** For convenience, even though section 565.020.2 also notes that the defendant may not be sentenced to probation in lieu of incarceration, the prison sentence authorized by this section is referred to herein simply as "life without parole." In addition, even though section 536.020.2 expressly acknowledges that a defendant sentenced to life without parole may be released by "act of the governor," an executive order pursuant to this language (or the governor's constitutional commutation authority) declaring that all juveniles serving such sentences will be eligible for parole consideration after a certain number of years would have no effect on the application of *Miller* to cases (like Hart's) on direct appeal. Nor it is necessary to address here the effect that such an order would have

on collateral challenges by juvenile offenders to first-degree murder convictions that were final before *Miller* was decided.

**6.** Alternatively, Hart argues that that this Court—armed with the severance doctrine—can rewrite section 565.020.2 and create a new provision allowing juvenile offenders guilty of first-degree murder to be sentenced anywhere from 10 to 30 years or life (with parole). As discussed below, whatever authority this Court may have to sever unconstitutional language from an otherwise constitutional statute, that authority does not justify the statutory alterations envisioned by Hart's alternative argument.

determines it is just and appropriate in light of the defendant's age, maturity, and the other factors discussed in *Miller.*

This distinction is so critical to a proper understanding and application of *Miller* that it bears additional scrutiny. Rather than attempt to characterize or paraphrase this essential point, however, it is better to let *Miller* speak for itself:

> We therefore hold that the Eighth Amendment forbids a sentencing scheme that mandates life in prison without possibility of parole for juvenile offenders. By making youth (and all that accompanies it) irrelevant to imposition of that harshest prison sentence, such a scheme poses too great a risk of disproportionate punishment.... *Although we do not foreclose a sentencer's ability to make that judgment in homicide cases, we require it to take into account how children are different,* and how those differences counsel against irrevocably sentencing them to a lifetime in prison.

*Miller,* 132 S.Ct. at 2469 (emphasis added).

> *Our decision does not categorically bar* a penalty for a class of offenders or type of crime—as, for example, we did in *Roper* or *Graham. Instead, it mandates only that a sentencer follow a certain process—considering an offender's youth and attendant characteristics—before imposing a particular penalty.*

*Miller,* 132 S.Ct. at 2471 (emphasis added).

> *Graham, Roper,* and our individualized sentencing decisions make clear that a *judge or jury must have the opportunity to consider mitigating circumstances before imposing the harshest possible penalty for juveniles.* By requiring that all children convicted of homicide receive lifetime incarceration without possibility of parole, regardless of their age and age-related characteris-

tics and the nature of their crimes, the mandatory sentencing schemes before us violate this principle of proportionality, and so the Eighth Amendment's ban on cruel and unusual punishment. We accordingly reverse the judgments ... and *remand the cases for further proceedings not inconsistent with this opinion.*

*Miller,* 132 S.Ct. at 2475 (emphasis added). *See also id.* at 2460, 2466, 2468, 2468–69 (cataloging age-related factors that the sentencer must be allowed to consider before the Eighth Amendment will permit a juvenile offender to be sentenced to life without parole).

From these forceful and repetitious statements, it is reasonable to infer that the Supreme Court did not intend for *Miller* to be misused in precisely the way that Hart suggests, i.e., that the Supreme Court was not holding that the Eighth Amendment categorically prohibits life sentences without parole for juvenile offenders found guilty of first-degree murder. *Id.* at 2469 ("we do not consider Jackson's and Miller's alternative argument that the Eighth Amendment requires a categorical bar on life without parole for juveniles, or at least for those 14 and younger").

Applying *Miller* to the present case, it is clear that the constitutional defect in Hart's sentence for first-degree murder is not its length or the fact that he will not be eligible for parole. Instead, Hart's sentence of life without parole violates the Eighth Amendment because—and only because—it was imposed without any opportunity for the sentencer to consider whether this punishment is just and appropriate in light of Hart's age, maturity and the other factors discussed in *Miller.* Accordingly, this case must be remanded for resentencing using a process by which the sentencer can conduct the individualized

analysis required by *Miller* and, on that basis, determine whether life without parole is a just and appropriate sentence for Hart under all the circumstances.

Until the case is remanded and the sentencer makes the determination *Miller* requires, Hart's claim that section 565.020 is void is premature. As noted above, Hart claims that section 565.020 is void for lack of a constitutionally permissible punishment because, like the death penalty, life without parole is an unconstitutional sentence for all juvenile offenders. The Court rejects this argument because, if the sentencer determines on remand that life without parole is a just and appropriate sentence for Hart under all the circumstances, that sentence is constitutional under *Miller*. Therefore, Hart's claim will fail because—at least as applied to him—section 565.020 will provide a constitutionally permissible punishment. If the sentencer is not persuaded, however, Hart's claim will succeed and his convictions for first-degree murder and the related armed criminal action will not stand. Whatever the outcome, Hart's claim cannot be decided until the sentencer on remand makes the determination that *Miller* requires.

### III. Procedure on Remand

Because Hart's sentence of life without parole for first-degree murder was imposed in a manner that violated the Eighth Amendment, he must be re-sentenced using the process described in *Miller*. That process, and its impact on Hart's claim that section 565.020 is void, is discussed below.

### A. Hart's Waiver of Jury Sentencing under § 557.036.4(1)

Hart contends that, if he is to be re-sentenced, he should not be bound by the waiver of jury sentencing he filed prior to his trial pursuant to section 557.036.4(1). He claims that he waived jury sentencing solely because he thought the length of his sentences for the three non-homicide crimes would not make any practical difference; therefore, it did not matter whether the judge or jury decided that question. Hart argues that this was not a knowing and intelligent waiver of his rights under section 557.036 because it was based on his belief—now proved wrong by *Miller*—that a sentence of life without parole for first-degree murder was inescapable.

The state concedes that, at the time Hart waived jury sentencing, a sentence of life without parole appeared inescapable—but **only** if Hart was found guilty of first-degree murder. The state argues that, when he decided to waive jury sentencing, Hart knew there still was a chance that the jury would find him guilty of second-degree murder (or acquit him of murder altogether) and that, under those circumstances, Hart would be facing a wide range of discretionary sentences for the rest of his crimes. Therefore, the state insists that the waiver should be enforced on remand because it represented a knowing and intelligent decision that Hart preferred to be sentenced by the judge under any circumstances in which the length of his other sentences would matter, i.e., if he escaped a sentence of life without parole under section 565.020.

The state is correct. If Hart had waited to waive jury sentencing until after the jury had found him guilty of first-degree murder, it would be reasonable to conclude that such a waiver was based solely on the apparent inevitability of a sentence of life without parole under section 565.020. *See State v. Nathan*, 404 S.W.3d 253, 2013 WL 3984730 (Mo. banc 2013) (decided concurrently herewith). But this conclusion is not reasonable here. Hart's waiver could not have been based solely on a mistaken

belief that a life sentence without parole was certain because, when Hart made his waiver, the jury had not found him guilty of first-degree murder and might never do so. Hart is presumed to have known that, if he was found guilty of second-degree murder, the prison sentences authorized for that crime by section 558.011.1(1) are between 10 to 30 years or life (with parole). This is the same as the authorized range of prison sentences for Hart's first-degree robbery charge, and the range of prison sentences authorized under section 571.015.1 for Hart's armed criminal action charges is a minimum sentence of three years with no upper limit.

Therefore, the only reasonable conclusion is that Hart's decision to waive jury sentencing was based on his belief that he would fare better by choosing to have the judge decide the length of his sentences— at least that would be his best choice to the extent that the choice would matter at all, i.e., if the jury were to find him guilty of second-degree murder or acquit him of murder entirely. Accordingly, because Hart waived his rights under section 557.036 at a time when there remained at least some possibility that his choice of sentencer might have a meaningful impact on the length of time that he ultimately would serve in prison, the Court cannot find that Hart's waiver was not knowing and intelligent on the grounds that he mistakenly believed a sentence of life without parole was inevitable.

This does not end the analysis, however. Though it is reasonable to assume that Hart's decision to waive jury sentencing was made in anticipation of the possibility (however slim) that his choice of sentencer might matter (i.e., that the jury would not find him guilty of first-degree murder), it also is reasonable to assume that his decision was based solely on which sentencer—the judge or the jury—Hart thought would give the more lenient sentences. In the wake of *Miller*, however, it now is clear that Hart's belief as to the role of the sentencer was mistaken—and mistaken in a very material way.

*Miller* requires that, if life without parole is the only legislatively authorized punishment available for a juvenile offender, the sentencer must decide whether that sentence is just and appropriate for the particular offender under the particular circumstances of the case. This is a **new decision** that the sentencer has not been required to make in the past; at least not explicitly. That decision is made implicitly each time the sentencer decides between legislatively authorized punishments. *See* § 557.036.3 (in jury sentencing, jury assesses and declares the appropriate punishment within the authorized range after considering "nature and circumstances of the offense, and the history and character of the defendant"); § 557.036.1 (court imposes sentence within the authorized range after considering "all the circumstances, having regard to the nature and circumstances of the offense and the history and character of the defendant"). *Miller* holds this decision cannot be inferred, however, where there is only one legislatively authorized sentence for the sentencer to impose. Therefore, *Miller* requires the sentencer to make this decision explicitly before a juvenile offender can be sentenced to life without parole.

Not only is this a new decision, it is a new **type** of decision. Thus, even though it is reasonable to assume that Hart waived his right to jury sentencing based on which sentencer he thought would be more lenient in determining the length of his sentences, it is not reasonable to assume that Hart ever considered whether he would prefer the judge or jury to make the new—and qualitatively different—decision now required by *Miller*.

Accordingly, Hart's waiver of jury sentencing dated July 25, 2011, may not be enforced on remand. Hart may elect again to waive jury sentencing pursuant to section 557.036.4(1), but he is not required to do so.

## B. Re-sentencing under *Miller*

As held above, Hart must be re-sentenced for first-degree murder because he was sentenced to life without parole without any individualized assessment that this sentence was just and appropriate under Hart's particular circumstances. It is neither necessary nor appropriate for this Court to attempt to anticipate all of the issues that may arise on remand. Certain questions are so likely to arise, however, that it is appropriate to address them here and thereby avoid unnecessary litigation or further remands in this case.

First, no consensus has emerged in the wake of *Miller* regarding: (a) whether the state or the defendant should bear the risk of non-persuasion on the determination that *Miller* requires the sentencer to make, and (b) the burden of proof applicable to that determination. In other words, does Hart have to persuade the sentencer that life without parole is unjust and inappropriate, or must the state persuade the sentencer that such a sentence is just and appropriate? And, is it sufficient that the sentencer is satisfied the proposition is more likely than not, or must the sentencer be convinced of the proposition beyond a reasonable doubt? Until further guidance is received, a juvenile offender cannot be sentenced to life without parole for first-degree murder unless the state persuades the sentencer beyond a reasonable doubt that this sentence is just and appropriate under all the circumstances. *Cf. Cunningham v. California*, 549 U.S. 270, 290, 127 S.Ct. 856, 166 L.Ed.2d 856 (2007).[7]

Second, unless Hart decides to waive jury sentencing on remand, the jury must be instructed properly that it may not "assess and declare" that Hart's punishment for first-degree murder should be life without parole unless it is persuaded beyond a reasonable doubt that this sentence is just and appropriate under all the circumstances. Such instructions may be found in Series 305 and 314 in the MAI–CR 3d (among others), either as written or with such modifications as are necessary to fit this new procedure, and the court may be required to draft new instructions. But, with no chance to hear the parties' evidence or review their proposed instructions and related briefing, this Court is in no position here to declare what those instructions should be. The trial court on remand will be in the best position to craft whatever instructions will best ensure that the jury's determination is guided by and firmly rooted in the type of circumstances and factors discussed throughout *Miller* and that the jury's determination, therefore, will be the product of the individualized assessment that *Miller* holds is guaranteed to juvenile offenders by the Eighth Amendment.

This Court rejects the argument, however, that the sentencer must be given a choice of punishments for first-degree murder, i.e., that it must be able to choose between life without parole and some lesser punishment. If the legislature authorizes other constitutionally permissible pun-

---

7. To be clear, the Court holds only that the state bears the burden of persuasion regarding the determination that *Miller* requires the sentencer to make in first-degree murder cases involving a juvenile offender. The Court does not hold that this question is the equivalent of a statutory aggravator in a death penalty case or that, if the sentencer is persuaded that such a sentence is just and appropriate, it must identify the specific facts or circumstances that justify this sentence.

ishments for juvenile offenders found guilty of first-degree murder, Missouri judges and juries, of course, will be permitted (and required) to choose among them. Until that occurs, however, the constitutional imperative inherent in the separation of powers does not permit this Court to allow the sentencer to consider any punishments for first-degree murder that the legislature has not approved.

Nothing in *Miller* expressly requires that the sentencer be given multiple punishments from which to choose, and this Court rejects the argument that such a choice is necessary for the sentencer to give a meaningful, informed answer to the only question that *Miller* poses: whether life without parole is a just and appropriate sentence under all the circumstances. As explained above, *Miller's* prohibition against "mandatory" sentences of life without parole is a prohibition only against imposing such a sentence when the sentencer has not made an individualized determination that this sentence is just and appropriate in light of the offender's age, age-related factors and other surrounding circumstances. The process set forth in this opinion satisfies the Eighth Amendment concerns raised in *Miller*.

When the jury is the sentencer, however, the absence of any alternative to life without parole could lead jurors to speculate that the defendant will escape punishment altogether if the jury rejects that sentence under the analysis *Miller* requires. Therefore, the trial court should instruct the jury, before it begins its deliberations, that if it is not persuaded that life without parole is a just and appropriate

sentence under all the circumstances of the case, additional instructions concerning applicable punishments will be given at that time. This procedure is adequate to address the risk of such speculation, but, even if it were not, no amount of speculation now concerning speculation later can justify or excuse this Court violating separation of powers by inventing alternative punishments it has no authority to impose.

On remand, after the parties have presented their evidence and arguments regarding the question posed by *Miller*, the sentencer must determine whether life without parole is a just and appropriate sentence for the first-degree murder Hart committed. If the sentencer is persuaded of this beyond a reasonable doubt, the trial court must impose that sentence. If the state fails to persuade the sentencer of this proposition beyond a reasonable doubt, Hart cannot receive that sentence. In that event, the trial court must declare section 565.020 void as applied to Hart on the ground that it fails to provide a constitutionally valid punishment for the crime it purports to create.

If section 565.020 is void, the trial court must vacate the jury's verdict finding Hart guilty of first-degree murder and enter a new finding that he is guilty of second-degree murder under section 565.021.1(1).[8] The trial court also must vacate the jury's verdict finding Hart guilty of armed criminal action based on Hart having been found guilty of first-degree murder and enter a finding that he is guilty of armed criminal action in connection with the second-degree murder.

---

**8.** Hart concedes that, if section 565.020 is void as applied to him and he cannot be guilty of first-degree murder, it is proper to find him guilty of second-degree murder. Second-degree murder under section 565.021.1(1) is a lesser-included offense of the first-degree murder with which Hart was charged, and

Hart admits that the jury could not have found him guilty of first-degree murder had it not unanimously found beyond a reasonable doubt that the state had proven each of the facts constituting the elements of second-degree murder.

After the trial court enters these findings, the sentencer will determine Hart's sentences within the statutory range applicable to these crimes. *See* §§ 558.011.1(1) (range applicable to second-degree murder is 10 to 30 years or life (with parole)) and 571.015.1 (range applicable to armed criminal action is a minimum of three years with no upper limit). In other words, if Hart does not waive his right to jury sentencing on remand, Hart's sentences for second-degree murder and armed criminal action also will be determined by the jury under section 557.036.3, and the instructions in this regard are the "additional instructions" the jury was told it would be given if it was not persuaded that life without parole is a just and appropriate sentence for Hart under all the circumstances. Conversely, if Hart waives jury sentencing such that the trial court must make the determination required by *Miller*, the trial court will determine Hart's sentences for second-degree murder and armed criminal action in the event it determines that life without parole is not a just and appropriate sentence for first-degree murder.

Whether Hart waives jury sentencing on remand or not, the question of Hart's sentence for second-degree murder must not arise—and it should not be submitted to the sentencer—unless and until the sentencer has deliberated upon and rejected sentencing Hart to life without parole for first-degree murder.

The Court recognizes that the sentencing procedure described above is unusual and may even require two separate submissions to the sentencer in a single penalty phase. However, this procedure is the necessary result of the Court's obligation to enforce the requirements of the Eighth Amendment as articulated in *Miller* without violating the legislature's prerogative to decide which punishments will be authorized for which crimes. Any result that would permit the sentencer to impose any punishment for first-degree murder other than the two punishments authorized by section 565.020 would be an unjustified and wholly unnecessary violation of separation of powers. Thus, the procedure described above gives Hart the benefit of the *Miller* decision without usurping the legislature's authority.

This procedure is intended only as a stop-gap measure, however. Under our constitution, only the legislature has the authority to decide whether and how to respond to *Miller* by authorizing additional punishments for juvenile offenders found guilty of first-degree murder. Until the legislature exercises that authority,[9] the procedure outlined above represents an appropriate way to enforce the Eighth Amendment as interpreted in *Miller* while respecting the constitutional separation of powers.

## C. Severance Cannot Add Punishments to § 565.020

The state disagrees with Hart's claim, addressed above, that section 565.020 is void for lack of a valid punishment. Even if the sentencer on remand is not persuaded that life without parole is a just and appropriate sentence for Hart,

9. In the 2013 legislative session, the first since *Miller*, the Missouri General Assembly considered several bills that sought to address the effects of *Miller* on section 565.020.2. *See, e.g.,* House Bill No. 541 (2013) (mandatory sentence for juvenile offenders of life in prison with no eligibility for parole during the first 50 years); Senate Bill 377 (2013) (same); House Bill 619 (2013) (mandatory sentence for juvenile offenders of life in prison with no eligibility for parole during the first 25 years); Senate Bill 408 (2013) (same); Senate Bill 253 (2013) (no mandatory sentence for juvenile offenders, authorizes range of punishment between 10 years and life without parole).

the state contends that section 565.020 need not be declared void and the other consequences discussed above need not occur. Instead, the state argues that an artful application of the severance doctrine will allow this Court to find that section 565.020 authorizes more punishments than its plain language contemplates. Specifically, the state argues that the Court should use severance to rewrite section 565.020 such that the sentencer is allowed to choose between sentencing a juvenile convicted of first-degree murder to life without parole and sentencing that juvenile to life **with** the possibility of parole. In the alternative, the state suggests (though admittedly with less conviction) that severance will allow the Court to rewrite this statute in such a way that it mandates life sentences (with parole) for all juveniles found guilty of first-degree murder.[10]

Even though the state tries to downplay the extent of the rewrite for section 565.020.2 that it is proposing, the Court rejects—utterly and completely—the state's invitation to engage in any rewrite of this statute. And the changes that the state is proposing are greater than it seems to realize. By its plain language, section 565.020 applies to all first-degree murders, not merely those involving juvenile offenders. The state's proposed rewrite, on the other hand, applies only to juvenile offenders. But the state's proposed rewrite cannot apply to all juveniles found guilty of first-degree murder because, under *Miller*, the sentencer will determine that a sentence of life without parole is entirely justified for some of those juveniles. Any rewritten section

565.020.2, therefore, must be limited only to those juvenile offenders for whom the sentencer has rejected this sentence after evaluating all the surrounding circumstances. Taking all of these limitations into account, the rewrite of section 565.020.2 that the state is proposing would need to look something like this, with the severed language indicated by ~~striketh-rough~~ and the new language indicated by underline:

> Murder in the first degree is a class A felony, and the punishment shall be either death or imprisonment for life without eligibility for probation or parole, or release except by act of the governor; except that, if a person has not reached his ~~sixteenth~~ <u>eighteenth</u> birthday at the time of the commission of the crime the punishment shall be imprisonment for life without eligibility for probation or parole, or release except by act of the governor <u>if, but only if, the jury is persuaded beyond a reasonable doubt that such a punishment is just and appropriate in light of the offender's age, maturity and other individual facts and circumstances regarding the offender or the crime but, if the jury is not so persuaded, the punishment shall be imprisonment for life and the offender shall be eligible for probation or parole,</u> ~~or release except by act of the governor.~~

The foregoing model demonstrates that "severance" is a gross mischaracterization of the changes needed to achieve the result the state advocates. The severance doctrine never has been used, in this Court or any other, to justify replacing a statute drafted by the legislature with one of the

---

**10.** Hart, too, claims refuge in the severance doctrine should his other arguments fail. He argues that the Court should use severance to eliminate all of the language in section 565.020.2 except the introductory phrase: "Murder in the first degree is a class A felony[.]" Hart contends that this will allow the

sentencer to give a juvenile offender convicted of first-degree murder any sentence within the usual range for class A felonies, i.e., 10 to 30 years or life (with parole). As with the state's efforts to unbridle the severance doctrine, the Court rejects this argument.

judiciary's own invention. This is what the state suggests, but this the Court will not do.

To misuse the severance doctrine in the way the state suggests would require the Court to overstep its constitutional boundaries in any context. To do so with a criminal statute would be even worse. Severance does not authorize—and cannot justify—an intrusion by this Court into the legislative prerogative to determine what is (and is not) a crime under Missouri law and to authorize which punishments will be (and will not be) applicable to these crimes. The result of the rewrite suggested by the state is to authorize a life sentence that leaves the juvenile offender eligible for parole. Such changes would not further the legislature's intent; they would supersede it. Nothing in section 565.020.2 suggests that the legislature intended for parole to be available to any person found guilty of first-degree murder, regardless of their age, and the statute goes to great lengths to prohibit such a result.

It is possible that the legislature would have authorized an alternative sentence of life with parole for juvenile offenders found guilty of first-degree murder if it had known of *Miller* in 1990, when section 565.020 was enacted last. Such speculation finds even less support now, however, as few of the proposed legislative responses to *Miller* offer this alternative and most expressly reject it. *See infra,* at n.9. But speculation about the legislature's intent is irrelevant. No such speculation can justify the Court rewriting a statute to authorize what its plain language now forbids, even if the Court somehow could be sure that this is what the legislature would have done (or will do now).

When analyzing severability, this Court's "first point of reference" is section 1.140, RSMo. *Associated Indus. of Missouri v. Dir. of Revenue,* 918 S.W.2d 780,
783 (Mo. banc 1996). Section 1.140 provides:

> The provisions of every statute are severable. If any provision of a statute is found by a court of competent jurisdiction to be unconstitutional, the remaining provisions of the statute are valid unless the court finds the valid provisions of the statute are so essentially and inseparably connected with, and so dependent upon, the void provision that it cannot be presumed the legislature would have enacted the valid provisions without the void one; or unless the court finds that the valid provisions, standing alone, are incomplete and are incapable of being executed in accordance with the legislative intent.

§ 1.140, RSMo 2000.

However, section 1.140 does not apply when a statute is unconstitutional only "as applied" to a particular defendant or circumstance. *Associated Indus.,* 918 S.W.2d at 784 (section 1.140 "does not address the 'as applied' situation"). When there is an "as applied" constitutional violation, "the [severability] doctrine operates in a different fashion." *Associated Indus.,* 918 S.W.2d at 784.

> "It is not possible to deal with [the "as applied"] situation by invalidating, or excising, part of the text and allowing the remainder to continue in effect. If the act is to be sustained, *its language must be restricted in application* to those objectives within the .jurisdiction of the legislature." Stated another way, *the statute must, in effect, be rewritten to accommodate the constitutionally imposed limitation,* and this will be done as long as it is consistent with legislative intent.

*Id.* (quoting Norman J. Singer, SUTHERLAND STAT. CONST. § 44.14 at 494 (5th ed.1993)) (emphasis added).

The state seizes upon *Associated Industries'* use of the phrase "the statute must, in effect, be rewritten to accommodate the constitutionally imposed limitation" to justify the substantial revisions necessary to accommodate its argument in this case. This is not a proper reading of *Associated Industries,* however, or of the treatise on which it relies. As the language quoted above clearly states, the scope of the "rewrite" referred to was only to **restrict** the statute from an unconstitutional application.

To understand properly how severance applies when a statute is unconstitutional only "as applied," one need look no further than the construction given to section 565.020.2 after *Roper* decided that the Eighth Amendment categorically barred the death penalty for juvenile offenders. Following *Roper,* section 565.020.2 was "effectively rewritten" so that the death penalty would not apply to **any** juvenile offenders—despite the statute's plain language authorizing the death penalty for juvenile offenders who were 16 or 17 years old when they committed the offense. This, and only this, is what *Associated Industries* meant by the phrase: "the statute must, in effect, be rewritten to accom-modate the constitutionally imposed limitation." *Associated Indus.,* 918 S.W.2d at 784. Therefore, neither that case nor section 1.140, nor any other aspect of Missouri law, authorizes this Court to engage in the sort of wholesale rewrite of section 565.020.2 that the state proposes.[11] *See Akin v. Dir. of Revenue,* 934 S.W.2d 295, 300 (Mo. banc 1996) ("severability permits one offending provision of a law to be stricken and the remainder to survive [but it] has never allowed courts to insert words in a statute which were not placed there by the General Assembly").

■ "Fixing of the punishment for crime is a legislative and not a judicial function." *State v. McGee,* 361 Mo. 309, 234 S.W.2d 587, 590 (banc 1950). Section 565.020.2 declares that the only authorized punishments for first-degree murder are death or life in prison without parole. If, in a particular case, neither of these penalties can be imposed without violating the Eighth Amendment, then section 565.020 fails to provide a constitutionally permissible punishment for first-degree murder and—for that case only—the statute is void. The Court rejects any application of the severance doctrine (or any other form

---

11. There are additional reasons why section 1.140 and common law severance are not appropriate here. As discussed above, severance only applies when a statute is unconstitutional. Here, there is no possibility that section 565.020.2 is unconstitutional. As discussed above, if the sentencer is not persuaded that life without parole is a just and appropriate sentence, section 565.020.2 must be declared void as applied to that offender. But, in this context, **void** is not the same as **unconstitutional.** The rule that a criminal law is void if it fails to provide a valid punishment is not a rule of constitutional law. Instead, it is a rule of statutory interpretation, rooted in the understanding that only the legislature—not the courts—can create crimes and authorize the punishments that will apply. *See, e.g., State ex rel. Williams v. Marsh,* 626 S.W.2d 223, 235 (Mo. banc 1982) ("[t]he duty and power to define crimes and ordain punishment is exclusively vested in the Legislature"). So even if it turns out that section 565.020.2 is void as applied to Hart (or to some other juvenile offender), that does not mean that section 565.020 is unconstitutional, even on an "as applied" basis. As such, there is no proper basis on which to employ severance. Logic confirms this conclusion. The object of the severance doctrine, when it applies, is to strike through unconstitutional language to give full force and effect to the language that remains. If section 565.020.2 is void because it does not provide a valid punishment, the flaw is in what is missing from the statute. Severance cannot strike through what is missing, any more than it can add authorized punishments by crossing out words.

of judicial construction) that results in any punishments for first-degree murder other than those plainly authorized in section 565.020.2. To reach any other conclusion would require the Court to exceed its authority and violate constitutional separation of powers.

## IV. Videotape of Hart's Interrogation

■ Following his arrest, Hart was questioned separately by detectives investigating certain robberies (including the robbery of Ms. Hellrich) and detectives investigating the murder of Mr. Sindelar. Hart received repeated *Miranda* warnings and waived his right (both orally and in writing) to have counsel present for any questioning. The last two interrogations, which came after Hart was identified in a lineup, were videotaped. On appeal, Hart contends that it was reversible error to play this videotape for the jury. It is necessary to address these claims of trial error before Hart's case can be remanded for re-sentencing for first-degree murder and, if necessary, for the additional proceedings described above.

### A. Inadmissible "Other Crimes" Evidence

Hart did not move to suppress his videotaped statements pursuant to Rule 24.05, and he made no other pretrial motions concerning their admissibility. However, in Hart's opening statement to the jury, his counsel told the jury that Hart's incriminating statements were false, that they had been coerced, and that alibi evidence would show that Hart was not involved in the incidents alleged.

The state asked for a sidebar prior to calling the first witness who would be discussing Hart's interrogations and the videotape. During this colloquy, the state explained to the court that the video showed Hart being questioned about robberies that had occurred the day before those for which Hart was charged. Hart denied any involvement in the other robberies, and the videotape shows that the interrogation moved on to other subjects.

Both the state and defense counsel told the trial court—which had not been asked to review the videotape prior to trial—that the entire exchange concerning the other robberies lasted only a minute or two and that this exchange occurred in the middle of a videotape lasting more than 50 minutes. The state and defense counsel apparently had agreed before trial simply to turn the volume down during this exchange to avoid putting evidence of uncharged crimes before the jury. However, in light of defense counsel's comment to the jury that Hart's statements were "coerced," the state argued that the jury should be allowed to hear the entire tape. Otherwise, the state argued that the jury would be left to speculate about what was said during the audio "gap" and whether it had any bearing on Hart's claim that the jury should not believe the incriminating statements he made because they were "coerced."

Defense counsel argued that it was improper for the state to play this portion of the tape because it would introduce evidence of uncharged crimes tending only to prove Hart's propensity to commit armed robberies. The defense also argued that the entire video should be excluded because "it was coerced." Defense counsel did not claim at trial that the introduction of the videotaped statements was a violation of Hart's rights under the Fifth or Sixth Amendment, nor did counsel even suggest generally that the use of the videotape violated Hart's "constitutional rights." Instead, other than this reference to Hart's statements being "coerced," nearly all of the defense's argument at trial was focused on its claim that the portion of the videotape containing ques-

tions about other robberies was irrelevant and unfairly prejudicial to Hart. The trial court repeatedly noted that it had not seen the videotape and, therefore, that it could not know precisely the exchange to which Hart was objecting. Relying solely on the parties' characterization of the videotape, the trial court overruled defense counsel's objection.

 The trial court has broad discretion to admit or exclude evidence during a criminal trial, and error occurs only when there is a clear abuse of this discretion. *State v. Simmons,* 955 S.W.2d 729, 737 (Mo. banc 1997). Hart is correct that "generally, evidence of uncharged crimes, wrongs, or acts is inadmissible to show an accused is predisposed to criminal conduct." *State v. Goodwin,* 43 S.W.3d 805, 815 (Mo. banc 2001). But "vague references ... are not characterized as clear evidence linking a defendant to other crimes." *Id.*

Here, detectives asked Hart about a series of robberies that occurred less than 24 hours before the robberies at which he admitted he was present and that involved the same stolen blue Cutlass in which Hart admitted he rode. On the videotape, Hart denied any involvement in the other robberies, and the interrogation moved on. No further mention was made of the other robberies, either by the detectives on the videotape or by the state during Hart's trial. Such a passing reference to other robberies does not constitute "evidence of uncharged crimes, wrongs, or acts." Accordingly, it was not error for the trial court to admit this evidence. *See State v.*

*McFadden,* 369 S.W.3d 727, 741 (Mo. banc 2012) (fact that defendant's "photograph was identified in the police station, without any other incriminating reference," was not inadmissible evidence of other crimes).

Even if asking Hart whether he was involved in uncharged robberies was evidence of other crimes (despite Hart immediately and unequivocally denying any such involvement and the detectives not confronting him with, or even suggesting the existence of, any evidence linking him to those crimes), the trial court admitted this evidence to rebut defense counsel's earlier assertion to the jury that Hart's statements were "coerced." A defendant is entitled to argue that the jury should not believe incriminating statements made to the police, and (as discussed below) this argument is separate from and unrelated to a motion to suppress such statements on constitutional grounds. But, once Hart's counsel suggested that the jury should disregard Hart's incriminating statements on the ground that they had been "coerced," the trial court did not abuse its discretion by allowing the state to play the entire videotaped interrogation for the jury. The trial court believed it would be unfair to bind the state to a clumsy, self-censoring presentation[12] and thereby open itself to an inference that the censored portions would have supported Hart's theory of coercion. This factor, coupled with only a small risk—at most—that this brief exchange would cause the jury to believe Hart was predisposed to armed robberies, further demonstrates that the trial court's ruling was not an abuse of discretion.

**12.** If Hart had raised this issue before trial, the trial court would have been able to see and hear the specific questions to which Hart objected. More importantly, Hart's objection could be sustained at a time when it was still possible for the state to edit the questions out of the videotape instead of during a sidebar, when doing so would require the prosecutor to mute what then would seem like a very long 30 or 60 seconds of audio as he played the interrogation to the jury. If the trial court had been able to see the evidence and exclude it without creating any risk of jury speculation concerning coercion, it would have made for a much closer question had the trial court still chosen to overrule Hart's objection.

## B. Constitutional Grounds to Exclude Videotape

■ In addition to his evidentiary objection to the brief exchange during the videotaped interrogation that Hart contends was inadmissible evidence of other crimes, Hart argues that the trial court's decision to admit any portion of his videotaped interrogation violated his rights under the Fifth, Sixth and Fourteenth Amendments because his statements were "unknowing, unintelligent, and involuntary and the product of a coercive interrogation." Hart did not raise these constitutional claims, however, until the trial was over and the jury had found him guilty. As noted above, the only objections made at trial relating to the videotape were that it contained evidence of other crimes and that it had been "coerced." This was not sufficient to raise a constitutional claim.[13] *State v. Galazin*, 58 S.W.3d 500, 505 (Mo. banc 2001). Accordingly, this Court will review this claim only for plain error.

■ Hart's constitutional claims are based on his assertion that his statements were extracted by false promises. Specifically, Hart contends that he would not have made these statements if the detectives had not promised him that he would

not spend the rest of his life in prison, provided that he never had the gun that was used to kill Mr. Sindelar. Even if this constitutes a promise (which it does not), Hart concedes that promises do not—by themselves—render all subsequent statements constitutionally involuntary and thus inadmissible. Instead, promises made to the defendant are simply another circumstance to be considered in deciding whether, under the totality of all the circumstances, the defendant's statements were voluntary. *State v. Simmons*, 944 S.W.2d 165, 173 (Mo. banc 1997).

Here, no one promised Hart leniency in exchange for making a confession, nor is there any reasonable possibility that Hart understood the detectives' statements that way. Hart's story evolved considerably during the time he was being interrogated. He went from denying any involvement, to admitting being in the car only for the first robbery, to admitting that he was present at both robberies but only got out of the car for the first one. After admitting that he was at the scene of Mr. Sindelar's murder, Hart continued to deny that he fired the shot that killed him or that he ever even held the gun that was used. When the detectives investigating the robberies started to leave the interrogation so

13. The state argues Hart was required to raise his constitutional claim in a motion to suppress in order to preserve the question for appellate review. This Court disagrees. Rule 24.05 does not require this, nor is it compelled by the policies behind the rules governing preservation of error. However, the failure to make a motion to suppress means that the defendant bears the burden of showing that the challenged conduct was unconstitutional. *Galazin*, 58 S.W.3d at 505. In addition, a defendant who elects not to bring such a claim to the trial court's attention prior to trial assumes considerable practical risk—as this case demonstrates. Here, the defense's decision not to make a motion to suppress prior to trial meant that the court was forced to rule on the objections without having an opportunity to see the videotape or keep the jury waiting solely because of the defense's tactics. The court's decision to overrule Hart's objection without reviewing the videotape was not an abuse of discretion, and not merely because of the nature of Hart's objections. Even if Hart had chosen to wait to make a comprehensive constitutional objection at sidebar during trial, the court would not have been obligated to view the videotape before ruling, and appellate review of that ruling should be based on what the trial court knew, and was told about the evidence rather than the appellate court making the type of review of the videotape that defendant's tactics deprived the trial court of making prior to trial.

that the detectives investigating the homicide could continue, Hart asked whether he would be spending the rest of his life in jail. One of the detectives said "I don't believe you will be. I really don't. If what you're saying is true and that you didn't have that gun, you never had that gun." Hart pressed the point and the detective repeated this answer in substantially identical language twice more before ending the short exchange and leaving the room.

During the subsequent interrogation by the homicide detectives, Hart learned that he had been identified as being outside the car at the time Mr. Sindelar was murdered. Hearing this, Hart again changed his story. Though he continued to insist that he was not the shooter, Hart admitted that he was at the scene of the shooting and that he had gotten out of the car. Following this last admission, Hart asked one of the homicide detectives whether he would be spending the rest of his life in jail. The detective answered that it would "be up to a jury," and that the jury "would have to weigh out all those circumstances."

Neither of the two detectives' statements was a promise. The first detective offered Hart an opinion—a forecast—that was expressly conditioned on the truth of Hart's statements that he did not shoot Mr. Sindelar, which the jury later found Hart guilty of doing beyond a reasonable doubt. The second detective's statement was a simple and correct description of the procedure that awaited Hart. Neither of the two answers that Hart elicited contained any "implicit or explicit promise of possible leniency or mitigation of punishment." *State v. Schnick*, 819 S.W.2d 330, 336 (Mo. banc 1991). Accordingly, there is no likelihood that either or both of the detectives' statements were coercive or had any impact at all on whether Hart's

subsequent incriminating statements were voluntary.

Finally, in reviewing the totality of the circumstances, the Court notes two circumstances of significant import. First, Hart received *Miranda* warnings three times and waived his rights orally and in writing long before the detectives gave the answers that Hart now contends were involuntary. Second, Hart's questions about punishment and the detectives' answers came **after** he already had admitted that he was present at Ms. Hellrich's robbery and Mr. Sindelar's murder. Therefore, regardless of how Hart characterizes the detectives' answer, Hart could not possibly have been relying on those answers when he made the earlier incriminating statements, and the fact that Hart's earlier statements were voluntary makes it far less likely that anything he said after the detectives' answers was involuntary. Neither of these circumstances is dispositive, but together they strongly corroborate the other circumstances—both on and apart from the videotape—that undercut Hart's contention that his statements were involuntary.

Accordingly, Hart fails to demonstrate that the trial court's decision to allow the state to use Hart's statements at trial was error, let alone plain error, and his constitutional claim is rejected.

## V. Conclusion

For the reasons set forth above, this case is remanded for Mr. Hart to be resentenced for first-degree murder and, if necessary, for further proceedings consistent with this opinion. In all other respects, the judgment of the trial court is affirmed.

BRECKENRIDGE, STITH, DRAPER and TEITELMAN, JJ., concur; FISCHER, J., concurs in part and

dissents in part in separate opinion filed; RUSSELL, C.J., concurs in opinion of FISCHER, J.

ZEL M. FISCHER, Judge, concurring in part and dissenting in part.

I concur in the principal opinion in all respects except, in my view, Laron Hart's knowing and voluntary waiver of his right to have a jury participate in his sentencing should prohibit him from demanding that a jury participate in his sentencing on remand. Prior to the beginning of the guilt phase of Hart's original trial, at a time when he would not necessarily have been subject to a sentence of life without parole, he waived the right to have a jury participate in his sentencing. Pursuant to this Court's prior case decisions, a defendant may not waive jury sentencing in the original proceeding only to demand jury sentencing[1] on remand. Once a strategic jury waiver decision is made, the defendant should be held to his decision. Unlike the principal opinion, in my view, there is no qualitative difference in this resentencing context that should permit Hart to withdraw his knowing and voluntary waiver.

**Relevant Facts to Jury Waiver**

As the principal opinion acknowledges, Hart decided to waive jury sentencing before the guilt phase of his trial.[2] At the time he made this waiver, Hart could have been found guilty of first-degree murder or second-degree murder—and sentenced accordingly—or he could have been found guilty of nothing at all. Nevertheless,

Hart argues that he made his waiver, at least in part, because no amount of mitigating evidence would have changed the fact that the law mandated a life without parole sentence for a first-degree murder conviction. Hart's argument would be well taken if his waiver had occurred after the jury had found Hart guilty of first-degree murder.[3] But, as the principal opinion points out, when Hart waived his right, he did so with the knowledge that he might have been convicted of second-degree murder, an offense that carries a sentencing range of 10 to 30 years or life with possibility of parole. This Court should presume on this record, therefore, that Hart strategically waived his right to jury sentencing because he would have preferred to have the judge determine punishment even if he was found guilty of second-degree murder.

Before trial, the circuit court conducted, on the record, an inquiry into whether Hart's waiver was made knowingly, voluntarily, and intelligently. Hart affirmed that he wished to waive jury sentencing. He affirmed that he knew the judge would sentence him if he was found guilty, that the range of punishment would not be any different if he was sentenced by the judge, that he had discussed waiving jury sentencing with his lawyer, and that no one had talked him into waiving jury sentencing. Convinced that Hart's waiver was knowing and voluntary, the circuit court accepted it.

Once the right to jury sentencing is waived, it is considered waived for all fu-

---

**1.** Consistent with the principal opinion, the phrases "jury sentencing" and "sentencer" refer to the procedure authorized by § 557.036.3, RSMo Supp. 2012. Op. at 234–35 n. 2.

**2.** Pursuant to § 577.036, Hart's trial was bifurcated into a guilt phase and a sentencing phase.

**3.** This is the factual situation found in *State v. Nathan*, 404 S.W.3d. 253, 2013 WL 3984730 (Mo.2013), decided contemporaneously with this case.

ture proceedings. In *State v. Emery*, 95 S.W.3d 98, 102–03 (Mo. banc 2003), this Court held that because the defendant had waived his right to jury sentencing, he would not be entitled to jury sentencing on remand. In *State v. Nunley*, this Court held that the waiver of a right to jury trial by a guilty plea remains valid after the case is remanded. 341 S.W.3d 611, 621–22 (Mo. banc 2011). And in *State ex rel. Taylor v. Steele*, this Court held that a waiver of the right to jury sentencing remained valid on remand even though the waiver preceded several cases of the United States Supreme Court that changed the law regarding jury sentencing. 341 S.W.3d 634, 646–48 (Mo. banc 2011). *Taylor* held that the waiver remained valid because it was an affirmative knowing, voluntary, and intelligent waiver made as part of the defendant's sentencing strategy. *Id.* Taylor's resentencing without a jury was, therefore, proper.

The principal opinion, however, finds that Hart is entitled to jury sentencing because the sentencer must make a "new—and qualitatively different—decision" than the choice before the sentencer prior to *Miller*. Op. at 240–41. The principal opinion holds that the difference is that the sentencer must now explicitly decide "whether [life without parole] is just and appropriate for the particular offender under the particular circumstances of the case[;]" a determination that it did not need to make pre-*Miller*. Op. at 240.

In my view, the procedure announced by the Supreme Court in *Miller*, and this Court today, does not require that a jury be the sentencer if the right to jury sentencing was waived prior to the original trial when the jury, because of the possibility of a conviction of a lesser included homicide offense, would have had an alternative to life without parole. This case presents no substantive legal change to the punishment permitted or the evidence allowed on resentencing. *Miller* does not require the sentencer to find any additional facts to impose punishment. *Miller* holds that, to impose a sentence of life without parole on a juvenile homicide offender, the judge or jury must conduct an individualized review of the myriad of factors discussed in the *Miller* decision, including the defendant's age and the other circumstances surrounding the offense. *Miller v. Alabama*, —— U.S. ——, 132 S.Ct. 2455, 2471, 183 L.Ed.2d 407 (2012). Additionally, this Court's opinion today will not permit Hart to present any evidence that he would have been unable to present during his first trial. Section 557.036 allowed Hart to present evidence mitigating his punishment, including evidence relevant to the factors mentioned in *Miller*.

Much like the *Miller* decision itself, the change announced today is procedural rather than substantive. The principal opinion, correctly in my view, does not add alternative punishments for first-degree murder that the legislature has not approved; it only modifies the procedure for determining whether the legislatively authorized sentence may be imposed. While it is true that Hart may not have anticipated this procedural change when he decided to waive his right to jury sentencing, Hart certainly would have known that it was possible that the jury would be deciding how long he was to remain in prison. That strategic decision did not change. The range of possible sentences available at the time Hart decided to waive his jury sentencing provided an alternative to life without parole. The ultimate decision to be made at this point is how long Hart deserves to spend in prison. Most competent counsel representing a juvenile, when first-degree murder is a possibility, would strategically still prefer to have a judge,

rather than a jury, make this determination.

In my view, because Hart waived his right to jury sentencing prior to the guilt phase of his trial, this Court's precedents cited above support a holding that Hart be held to the waiver of his right to jury sentencing just like any other statutory or constitutional right that he knowingly and voluntarily waived.

## Conclusion

In conclusion, while it has been stated that you never have to give credit to a referee for making the right call, the reader should note the extraordinary care with which this case—and *Nathan,* decided contemporaneously—has been decided. The Court strictly adheres to the mandates of *Miller* without speculating as to what the United States Supreme Court may decide in the future, while at the same time, protecting the legislature's constitutional prerogative to decide the policy question of whether to authorize alternative constitutional sentence(s) to mandatory life without parole for juveniles who commit first-degree murder. The constitutionally delegated and cherished authority of the general assembly to make this policy decision comes with a constitutional and practical obligation to act accordingly. The legislature's continued failure so to act[4] will lead to the ever-present reality that juveniles who have been found guilty of first-degree murder by either a judge or a jury will have that conviction voided each and every time the sentencer determines that life

without parole is not a just and appropriate sentence for that juvenile. Those juveniles, who have been found guilty beyond any reasonable doubt of the most serious crime, will instead, by constitutional necessity, have their first-degree murder convictions voided and will be convicted and sentenced in accordance with the only legislatively authorized alternative: the punishment authorized for second-degree murder.

---

4. As noted in the principal opinion:

> In the 2013 legislative session, the first since *Miller,* the Missouri General Assembly considered several bills that sought to address the effects of *Miller* on section 565.020.2. *See, e.g.,* House Bill No. 541 (2013) (mandatory sentence for juvenile offenders of life in prison with no eligibility for parole during the first 50 years); Senate Bill 377 (2013) (same); House Bill 619 (2013) (mandatory sentence for juvenile offenders of life in prison with no eligibility for parole during the first 25 years); Senate Bill 408 (2013) (same); Senate Bill 253 (2013) (no mandatory sentence for juvenile offenders, authorizes range of punishment between 10 years and life without parole).

Op. at 243 n. 9.